T.C. Memo. 1999-268


UNITED STATES TAX COURT


UNITED PARCEL SERVICE OF AMERICA, INC. ON BEHALF OF ITSELF AND
ITS CONSOLIDATED SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15993-95.                    Filed August 9, 1999.

    <u>Joel V. Williamson</u>, <u>J. Allen Dougherty</u>, <u>Maurice M. Agresta</u>,
<u>Joseph R. Goeke</u>, <u>Kim Marie Boylan</u>, <u>Roger J. Jones</u>, <u>William A.</u>
<u>Schmalzl</u>, <u>Daniel Dumezich</u>, <u>Thomas L. Kittle-Kamp</u>, <u>Clisson S.</u>
<u>Rexford</u>, <u>Scott M. Stewart</u>, <u>Thomas C. Durham</u>, <u>Gayle L. Elsner</u>,
<u>Michelle J. Kim</u>, <u>Richard T. Morrison</u>, <u>Mary Ellen Kiruit</u>, and
<u>Wayne S. Kaplan</u>, for petitioner.

    <u>Theodore J. Kletnick</u>, <u>Suzanne Corbin</u>, <u>Curt M. Rubin</u>, <u>William</u>
<u>S. Garofalo</u>, <u>Maria T. Stabile</u>, <u>Elizabeth A. Maresca</u>, <u>Halvor Adams</u>
<u>III</u>, <u>Stephen C. Best</u>, <u>Paul S. Manning</u>, <u>Anthony J. Kim</u>, and <u>Ron J.</u>
<u>Mizrachi</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax as follows:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| 1983 | $2,330,687 | -- | -- | -- |
| 1984 | 64,870,674 | $3,243,534 | 50% of the interest due on $45,122,925 | $11,280,731 |

Respondent also determined that petitioner is liable for increased interest pursuant to section 6621(c)[1] on the portion of the 1984 deficiency attributable to respondent's determination that excess value charges are includable in petitioner's income.

After concessions,[2] the issues for decision are:

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent concedes that $8,855,121 of income earned on funds invested by Overseas Partners, Ltd. (OPL), is not income to petitioner pursuant to sec. 482.  Respondent determined that if petitioner must include excess value charges in gross income, petitioner is entitled to a corresponding deduction of $32,543,889 for shippers' claims.

Respondent concedes that $325,740 of the $1.2 million paid Liberty Mutual Insurance Group (Liberty Mutual) for claims adjustment services is deductible.  Respondent further concedes the deductibility of $50,000 paid by petitioner to Liberty Mutual for the retained layer of liability for losses above $250,000. These concessions reduce the amount of the deduction at issue

(continued...)

(1) Whether amounts collected by petitioner as "excess value charges" (EVC's)[3] from its customers must be included in gross income in 1984 pursuant to section 61. We hold that EVC's must be included in petitioner's income.[4]

(2) Whether petitioner is entitled to deductions under section 162 for any amounts paid to National Union Fire Insurance Co. of Pittsburgh, Pennsylvania (NUF). We hold that petitioner is not entitled to those deductions.

(3) Whether respondent properly disallowed petitioner's deduction of $11,151,675 paid to Liberty Mutual Insurance Group (Liberty Mutual) as California workers' compensation premiums. We hold that the deduction is allowable.

(4) Whether petitioner is liable for an addition to tax pursuant to section 6653(a)(1) and (2) for negligence or

---

[2](...continued)
with respect to the Liberty Mutual policy to $11,151,675.

In the notice of deficiency, respondent disallowed sec. 38 investment tax credits of $1.6 million and $19,006,175 reported by petitioner in 1983 and 1984, respectively. On Sept. 15, 1997, the parties filed a Joint Motion to Sever, requesting that the Court sever the investment tax credit issue. On Sept. 15, 1997, the motion to sever the sec. 38 investment tax credit was granted. The parties subsequently engaged in mediation and settled this issue.

[3]Throughout the opinion, "EVC" represents "excess value charge" and "EVC's" represents "excess value charges".

[4]As a result of our holding, we need not consider respondent's alternative arguments under secs. 482 and 845(a).

intentional disregard of rules or regulations for the tax year 1984. We hold that it is.

(5) Whether petitioner is liable for an addition to tax under section 6661 for a substantial understatement of tax for 1984. We hold that it is.

(6) Whether petitioner is liable for increased interest on substantial underpayments attributable to tax-motivated transactions under section 6621 for 1984. We hold that it is.

Some of the facts have been stipulated and are so found. The stipulations of facts are incorporated herein by this reference. At the time the petition was filed, petitioner was a Delaware corporation with its principal office in Atlanta, Georgia.

FINDINGS OF FACT

I. General

A. United Parcel Service

Petitioner is the largest motor carrier in the United States with a principal business consisting of the pickup and delivery of small packages and parcels. During 1983 and 1984, petitioner conducted its business through wholly owned subsidiaries in the United States, Canada, and West Germany. Petitioner, United Parcel Service of America, Inc. (UPS), had several wholly owned subsidiaries, including United Parcel Service, Inc.--New York (UPS-New York), United Parcel Service, Inc.--Ohio (UPS-Ohio), and

United Parcel Service General Services Co. (UPS-General Services).  UPS-General Services provides management services to affiliates of UPS.  UPS-New York provides ground delivery services in the eastern region of the United States.  UPS-Ohio provides ground delivery services in the central and western region of the United States.  Within the United States, petitioner generally provided statewide intrastate service[5] and interstate service between all points in the States and the District of Columbia.[6]  Another subsidiary, UPS-Air, provided air delivery service for packages traveling partially by air.

Petitioner had 62 operating districts in the United States.  Each district had an operational and administrative staff and a manager who was responsible for all district operations.  The district manager reported to 1 of 11 regional managers, who, in turn, reported to the corporate headquarters.

Generally, each package picked up by a UPS driver is delivered to a package operating center.  At each center, packages are unloaded from package cars and loaded onto trailers, which haul the packages either directly to another center for delivery or to a UPS sorting hub.  At the hub, packages are

---

[5]Petitioner did not provide intrastate service within Texas.

[6]There were limited exceptions pertaining to Texas, Hawaii, and Alaska in which petitioner did not provide full services.

sorted by destination, loaded back onto trailers, and hauled to the appropriate center, where they are loaded onto package cars for delivery.  Packages traveling by air are sorted at an air hub and transported to the center for delivery.

B.  Shipping Rates and Tariffs

As a domestic motor common carrier, petitioner was regulated by the Interstate Commerce Commission (ICC).  Petitioner's intrastate service was regulated by State transportation agencies and public utility commissions.  As an air carrier, petitioner was regulated by the Civil Aeronautics Board.

The ICC issued Certificates of Public Convenience and Necessity as evidence of the carrier's authority to engage in transportation as a common carrier by motor vehicle.  UPS-New York and UPS-Ohio each filed tariffs[7] and tariff supplements with the ICC.[8]  The ICC tariffs and tariff supplements contained provisions which governed the rates and services offered by petitioner to its shippers.  The tariffs filed with the ICC by

---

[7]A tariff is a "public document setting forth services of common carrier being offered, rates and charges with respect to services and governing rules, regulations and practices relating to those services."  Black's Law Dictionary 1457 (6th ed. 1990).

[8]Generally, a motor common carrier must publish and file with the ICC tariffs containing the rates for transportation it may provide.  See Trucking Industry Regulatory Reform Act of 1994, 49 U.S.C. sec. 10762(a)(1) (1994); see also Fabulous Fur Corp. v. United Parcel Serv., 664 F. Supp. 694, 695 (E.D.N.Y. 1987).

UPS-New York and UPS-Ohio which were in effect during the years in issue contained, among other things, provisions relating to the scope of operations, damaged and unclaimed property, methods of determining rates, and filing of claims. With respect to the scope of operations, the tariffs for both UPS-New York and UPS-Ohio provide: "Rates and provisions named in this tariff, or as amended, are limited in their application to the extent of the operating rights set forth below." The provisions of the tariffs governed the rates and services offered by petitioner to its shippers.

The ICC tariffs filed by UPS-Ohio and UPS-New York were similarly filed with the State transportation commissions of most of the States.[9] Individual State filings were required in the

---

[9]The tariffs filed by UPS-Ohio were filed with the State transportation commissions of Alabama, Arkansas, Colorado, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, New Mexico, North Carolina, North Dakota, Ohio, Oregon, South Carolina, South Dakota, Tennessee, Utah, and Washington.

The tariffs filed by UPS-New York were similarly filed with the State transportation commissions of Connecticut, Maryland, Massachusetts, New Hampshire, New York, Pennsylvania, Rhode Island, Vermont, and West Virginia.

In 1983 and 1984, the States of Arizona, Delaware, Florida, Maine, New Jersey, and Wisconsin did not regulate intrastate motor common carriers. In Wyoming, no regulatory filing was required. In Texas, intrastate service was limited to the Dallas-Fort Worth, Houston, and San Antonio metropolitan areas. In Hawaii, an intraisland service was commenced between all islands of the State. Petitioner did not operate in Alaska

(continued...)

States of California, Hawaii, Nebraska, Oklahoma, and Virginia. Whenever UPS-Ohio or UPS-New York made a change to its tariff, a tariff supplement was filed with the ICC.

1. Pre-1984

a. Excess Value Charges

Petitioner refers to its customers as shippers. Petitioner charged its shippers a fee for the shipment of each package based on the weight of the package, the distance that the package would travel, the value of the package, and various accessorial services offered by petitioner. Petitioner's rates were governed by the tariffs, which it submitted to the ICC and the various States. The tariffs[10] submitted to the ICC provided, among other things, for rates in cents per package and per pound as follows:

ITEM 1000

> \*     \*     \*     \*     \*     \*     \*

> The rate for delivery of packages, released to value not exceeding $100 per package, shall be 116.0¢ per package plus the following rates per pound or fraction thereof:

---

[9](...continued) outside the regulatory-free zones.

[10]The provisions of the tariffs were similar except that the tariff provided by UPS-Ohio further included "item 1040", which does not affect our decision, and we will not reproduce it in the opinion.

|  Zone  |  Rate  |
|--------|--------|
| 2......................... | 8.9¢ |
| 3......................... | 11.8¢ |
| 4......................... | 15.4¢ |
| 5......................... | 19.5¢ |
| 6......................... | 25.3¢ |
| 7......................... | 31.5¢ |
| 8......................... | 38.5¢ |

The rates published in item 1000 applied to all the packages shipped by petitioner.

Petitioner provided its shippers with a rate card that enabled shippers to determine what petitioner would charge for a particular shipment. The distance a package was to travel determined the number of zones from the point of origin that the package would cross. A package shipped to zone 2, for example, would travel approximately 150 miles. A package shipped to zone 3 would travel up to 300 miles. Zone 8 was the furthest zone and distance a package would travel within the United States. Zones 2 through 8 were represented as column headings at the top of the rate card.

Weight categories also determined how much petitioner charged shippers for transporting a particular package. The rate card listed weights down the left side of the table in 1-pound increments from 1 pound to 50 pounds. By cross-referencing the zone and the weight, a shipper could determine the exact shipping charge for a particular package whose released value did not exceed $100. There was an additional charge under the tariff

when a shipper declared the value of the package to be in excess of $100.

Under the tariff, shippers could also elect to purchase accessorial services that had additional charges.  Accessorial services included, among other things, collection on delivery (COD) and acknowledgment of delivery (AOD).

With respect to damaged and unclaimed property, the tariffs provided the following:

### DAMAGED AND UNCLAIMED PROPERTY

Whenever property is damaged by the carrier in the course of transportation, the carrier will tender the damaged property to the shipper and offer to pay for the damage, not to exceed the actual or declared value of the property, whichever is the lower.  If the shipper so elects, the carrier will pay the full actual or declared value of the property, whichever is lower, and title of the property shall thereupon pass to the carrier.

Thus, petitioner was obligated to shippers under the tariffs to pay up to the actual or declared value for loss or damages caused by petitioner during the course of transporting the package. Petitioner applied for and received from the ICC an order generally allowing petitioner and its shippers to agree in writing that petitioner's liability would be limited to a released value not exceeding $100 per package.  With respect to the released rate and EVC, the tariff provided as follows:

To determine rates in this tariff:

1.  Refer to governing rate basis tariff to determine appropriate zone for use in determining the poundage rate.

2.  Refer to Item 1000 or 1040 herein.

Released value of shipment:

The rates published in Item 1000 or 1040 are applicable only when the value of the property declared in writing by the shipper or agreed upon in writing as the released value thereof is as follows:

| | |
|---|---|
| Released to a value not exceeding $100 per package or article not enclosed in a package | Apply the rates as published in Item 1000 or 1040. |
| Released to a value exceeding $100 per package or article not enclosed in a package | Apply the rates as published in Item 1000 or 1040 as base rates, plus a value charge of 25 cents for each $100 or fraction thereof of value in excess of the valuation in which the base rate applies. |

Under the provisions of the tariff, petitioner received from its shippers 25 cents for each additional $100 of declared value of a package shipped, and petitioner referred to the additional amount as an "excess value charge" (EVC). If a shipper paid the EVC of 25 cents per $100 of value, part or all of the declared value of the package would be paid to the shipper in the event that the package was damaged, lost, or destroyed. In the event that a shipper did not declare the value of the package to be in

excess of $100, petitioner was liable to the shipper for the value of the package up to $100.

In June 1983, petitioner filed supplements to its ICC tariffs amending the provision related to the method of determining rates for shippers under the original tariff.  The supplements provided an additional clause with respect to the method of determining rates:

> Unless otherwise directed by the shipper, the carrier may remit excess valuation charges to an insurance company as a premium for excess valuation cargo insurance for the shipper's account and on its behalf. If the carrier does so, claims for loss of or damage to the shipper's property will be filed with and settled by the carrier on behalf of the insurance company.  In the event that the insurance company fails to pay any claim for loss of or damage to the shipper's property under the terms of its policy, the carrier will remain liable for loss or damage within the limits declared and paid for.[11]

Although the supplements were filed June 1983 and became effective July 1983, petitioner did not remit EVC's to an insurance company before 1984.

The declared value in excess of $100 is indicated on petitioner's package pickup record.[12]  The package pickup record

_____

[11]Identical changes were made to petitioner's State tariffs.

[12]Petitioner's pickup record states:

Unless a greater value is declared in writing on this receipt, the shipper hereby declares and agrees that the released value of each package or article not enclosed in a package covered by this receipt is $100,

(continued...)

was used to enter billing information into petitioner's billing system.  Billing information for regular customers and shippers who shipped parcels from petitioner's customer counters was entered into petitioner's computer system regularly by each district, and petitioner billed its regular customers weekly. The bills sent to petitioner's regular shippers reflected all amounts to be collected from those shippers.  Included, and itemized separately, on those bills were the EVC's and other miscellaneous charges.  All amounts collected from shippers by petitioner, including amounts for EVC's, were deposited into petitioner's bank accounts.

For the taxable year ended December 31, 1983, EVC's billed and/or collected from shippers were included in petitioner's reported income for tax, financial accounting, ICC, State regulatory, and Securities and Exchange Commission (SEC) reporting purposes.

### b.  Claims

Shippers' claims were governed by the tariffs submitted by petitioner to the ICC and the various States.  Petitioner's

---

[12](...continued)
which is a reasonable value under the circumstances surrounding the transportation.  The entry of a C.O.D. amount is not a declaration of value.  In addition, the maximum value for an air service package is $5,000 and the maximum carrier liability is $5,000.  Claims not made to carrier within 9 months of shipment date are waived. * * *

tariff 201-C effective January 31, 1983, included provision 510

relating to filing of claims, which provided:

> All claims for loss or damage to property transported or accepted for transportation in interstate or intrastate commerce must be in writing and must include reference to the pickup record number and date or copies of other documents sufficient to identify the shipment involved; must assert liability of the carrier for alleged loss or damage; must make claim for payment of a specified or determinable amount of money; and must be accompanied with a copy of the original invoice or, if no invoice was issued, other proof, certified to in writing, as to the value of the property or extent of the damage. * * *

Under tariff provision 510, a shipper was required to assert that

petitioner was liable for the alleged loss or damages.  Tariff

201-C also contained provision 520 limiting the time for filing

claims.  Provision 520 provided:

> As a condition precedent to recovery, claims must be filed in writing with the carrier within nine months after delivery of the property or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed; and suits shall be instituted against the carrier only within two years and one day from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice.  Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, the carrier hereunder shall not be liable, and such claims will not be paid.

Under provision 525, petitioner was required to promptly

investigate "each claim filed against [petitioner]".  With

respect to disposition of claims, tariff 201-C provides:

"Carrier after receiving a written claim for loss or damage to

property transported will pay, decline, or make a firm compromise settlement offer in writing to the claimant within 120 days after receipt of the claim by the carrier".  UPS-New York and UPS-Ohio, through their respective district offices, processed all claims for loss or damage to parcels, including any excess value portion of a claim.  When a shipper was in need of a verification of the status of a shipment, the shipper initiated an inquiry, by either telephone or mail, which was referred to the delivery information department of the district from which the shipment was made.

Tracing requests were initiated as a result of shippers' inquiries.  After the tracing request was completed, it was transmitted to the destination district via computer.  If the record showed that the package was delivered and signed for, the clerk made a copy of the delivery record.  If the tracing procedure was unsuccessful, petitioner assigned a loss damage investigation number to identify the shipper claim.

Petitioner remitted amounts for claims processed by UPS-New York and UPS-Ohio from petitioner's central bank account.  Generally, a single check was issued to a shipper if the shipper had declared excess value and a claim for loss or damage was paid.  Before 1984, petitioner reported claims paid in excess of $100 as an expense for tax, financial accounting, ICC, State regulatory, and SEC reporting purposes.

Petitioner made efforts to reduce claims, including excess value claims. Petitioner advised its drivers to pay extra attention to declared value packages. Petitioner also incurred added handling costs in connection with excess value packages.

In Metro New York, Long Island, New Jersey, and Metro Chicago, petitioner took special precautions to avoid loss or damage to high-value packages. For instance, in New York, with respect to jewelry and similar items, petitioner's driver would segregate them in his load, and upon arrival at petitioner's facility, a designated clerical person would meet the driver and take the packages containing the jewelry or other items. Under certain circumstances, the packages would be specially bagged and tagged. Thereafter, the appropriate contact person at the next destination of the package would be informed of the position of the package on the trailer. When the trailer reached its destination, a person would be present to retrieve the bag.

Petitioner instituted and used special parcel handling procedures, which involved segregating and protecting high-value parcels in other districts as well. Petitioner referred to the special handling procedure as "controlled parcel handling".[13]

---

[13]This procedure was not used in the Metro New York, Long Island, New Jersey, and Metro Chicago districts. Controlled parcel handling procedures that were stricter than the controls set forth in the loss prevention manual were applied in Metro New York, Long Island, New Jersey, and Metro Chicago.

Petitioner maintained a "Loss Prevention" manual that contained written standards and procedures on prevention of loss associated with the shipment of packages. Controlled parcel handling was addressed in a specific section of the loss prevention manual. As part of the controlled handling procedures, petitioner performed audits in its hub, transportation, and delivery operations to ensure security of high-value packages. Petitioner considered these procedures to be expensive and time consuming.

        c.   <u>Negotiations To Change Petitioner's Method of Handling Excess Value Charges</u>

Mr. Kenneth Johnson was the head of petitioner's insurance department. After various discussions with Mr. Walter Danielewski, petitioner's chief financial officer (CFO), regarding the manner in which petitioner collected EVC's, Mr. Johnson contacted the brokerage firm of Frank B. Hall (Hall).

        (1)  <u>Hall</u>

Hall was one of the largest insurance brokerage firms in the world. Mr. Johnson had first worked with representatives at Hall in 1981. At that time, Mr. George Corde, an experienced vice president of Hall, worked with Mr. Johnson in connection with insurance for petitioner's aircraft and other matters. Mr. Thomas Garrity was a Hall vice president who worked for Mr. Corde.

In 1982, Mr. Johnson met with representatives of Hall to discuss petitioner's EVC's.  At their first meeting regarding petitioner's EVC's, Mr. Corde advised Mr. Johnson of potential alternatives that might be available to petitioner, including the possibility of petitioner's forming its own insurance subsidiary. Thereafter, Mr. Corde and Mr. Garrity attended meetings relating to the planning, structuring, and implementation of petitioner's subsidiary and petitioner's excess value activity.

In September 1982, at the request of petitioner, Hall prepared a document titled "United Parcel Service--A Preliminary Analysis of an Insurance Subsidiary" (preliminary analysis).  The preliminary analysis indicated that Hall understood that petitioner currently was liable to its shippers for the value of any parcels lost or damaged up to $100.  The preliminary analysis indicated that Hall understood that those parcels with values in excess of $100 could be declared by the shipper, and the shipper could secure protection at a cost of 25 cents per $100 of value in excess of the first $100.  Hall further understood that while the protection provided by the EVC was not considered to be insurance, insurance could be provided by a UPS-owned insurance company.  The preliminary analysis then proceeded to make the following assumptions and conclusions:

> We have been advised that the revenues generated by this "declared value" protection for the 1981 year approximated $67,000,000 and that the loss in excess of

- 19 -

$100 per claim approximated $20,000,000.  In Exhibits II-1A and II-2A we have attempted to set forth the implications of this coverage to * * * [petitioner] on a net after tax basis.  In this Exhibit we have made the following assumptions:

1.   Revenues are in equal amounts payable at mid points of quarters;

2.   Expenses as percent of gross premium = 0%;

3.   Loss ratio = .299;

4.   Duration (in years) to ultimate value of losses = 2;

5.   Annual payout pattern - 70%, 30%;

6.   Plan reimburses gross paid losses for each month at the end of the following month;

7.   Applicable Federal Income Tax rate as percentage = 46%; and,

8.   Effective rate of interest per annum as percent = 12%.

Based upon these assumptions review of Exhibits II-1A and II-2A disclose that the contribution of this program to * * * [petitioner's] after tax earnings is $31,001,618 at the end of the second subsequent year when all losses are closed.

On February 24, 1983, a meeting was held at Hall's offices in Briarcliff Manor, New York, to discuss petitioner's excess value activity.  In attendance at this meeting were:  Messrs. Danielewski, Johnson, Pat Edmunds, Jerry Stein, and Jack McGuinness representing petitioner; Mr. Allen Dougherty, as petitioner's attorney; and Messrs. Corde, Garrity, and Roger Wade representing Hall.  Mr. Corde prepared a memorandum dated March

1, 1983, that summarized the purpose and content of the February 24 meeting at Briarcliff Manor.  The memorandum states:

The purpose of this meeting was to consider Frank B. Hall's proposal presented to * * * [petitioner] last September 1982 which dealt with the feasibility of creating a subsidiary insurance company.  The subject reviewed in the report dealt with declared value insurance and the utilization of an insurance subsidiary to handle customer risk of loss on property in transit.

The topics discussed in our Thursday meeting focused strictly on the declared value program and the viability of converting this into an insured plan that would produce, in the final analysis, an improved economic result for * * * [petitioner].  The report submitted by Hall dealt with the organization of a United Parcel insurance subsidiary company.  This new insurance entity would assume reinsurance from a licensed admitted US carrier who would underwrite the declared value program.

During the February 24 meeting, petitioner's tax counsel, Mr. Dougherty, expressed concern with the specifics of the Hall proposal, and he believed that the proposal would not be viewed favorably by the Internal Revenue Service (IRS).  Mr. Dougherty suggested an alternative whereby petitioner would form an insurance company in Bermuda to be owned by petitioner's employees and, in this manner, such a company would be classified as a noncontrolled foreign corporation.  Mr. Dougherty believed that the Bermuda insurance company could accept reinsurance of a licensed U.S. underwriter directly and not have U.S. tax obligations on profits until risk funds were repatriated.

After all the alternatives were discussed, it was agreed that petitioner would pursue the alternative to create an insurance subsidiary to act as a reinsurer.  Further, the insurance subsidiary would be owned by petitioner, and ultimately, petitioner might adopt a long-range strategy of transferring ownership in such a company to petitioner's shareholders.  Finally, it was agreed that Mr. Danielewski and other members of the UPS team would submit a proposal to senior management based on the following financial projections, as stated in Mr. Corde's March 1, 1983, memorandum:

UPS CURRENT POSITION

A:

| | |
|---|---|
| Projected 1983 Declared Value Revenue | $69,900,000 |
| Estimated 1983 Losses | $21,400,000 |
| Pretax Profit | $48,500,000 |
| Net After Tax Profit | $26,190,000 |

B-Alternative Program:

1. Insured Declared Value Program (U.S. Front)

| | |
|---|---|
| Estimated Annual Premium | $69,900,000 |
| *Estimated Expenses (6.5) | $4,485,000 |
| Net Underwriting Income | $65,415,000 |

2. UPS Insurance Subsidiary

| | |
|---|---|
| Foreign Reinsurance Premium Income | $65,415,000 |
| Ceding Commission - 2-1/2% | $1,747,500 |
| Net Premium Income | $63,667,500 |
| Expected Losses | $21,400,000 |
| Underwriting Profit | $42,267,500 |

C: Projected Benefit to * * * [Petitioner]          $16,077,500

| * | Front Fee | 2.0 |
|---|-----------|-----|
|   | Premium Tax | 3.5% |
|   | Federal Excise Tax | <u>1.0%</u> |
|   |  | 6.5% |

The $16,077,500 projected benefit to petitioner is the amount of Federal income tax petitioner would have otherwise paid and is based on the assumption that the underwriting profit, which was referred to as the "UPS Insurance Subsidiary" in Bermuda, would not be subject to Federal income tax.

### (2) AIG/NUF

American International Group, Inc. (AIG), was a holding company and the parent of over 500 subsidiary operating insurance and subsidiary companies. AIG Risk Management, Inc. (AIGRM), was a subsidiary of AIG. Mr. Joseph Smetana served as president and CEO of AIGRM and senior vice president of NUF. NUF was a wholly owned subsidiary of AIG and operated as a domestic insurance company.

On behalf of Hall, through a letter dated April 27, 1983, Mr. Corde contacted Mr. Smetana. In the letter, Mr. Corde apprised Mr. Smetana of petitioner's plan regarding the EVC's. Mr. Corde indicated in the letter that petitioner's plan contemplated that the shippers' property handled by petitioner would be insured under a master "Shippers Interest Policy". Further, the letter indicated that the contract of insurance would be issued to petitioner and would cover the property of the owners, shippers, consignees, or other interested parties. With

respect to the anticipated risk or exposure to AIG, the letter stated:

> The Shippers Interest Program is to be 100% reinsured to Union International/Hamilton, Bermuda. Union will then retrocede this risk to other insurers. This, therefore, would leave the shippers interest issuing carrier in a "fronting" capacity with essentially no risk or exposure to loss under the program.

Finally, the letter requested that AIG submit a proposal on petitioner's Shippers Interest Program setting forth:

a.   The fronting/administration fee it would require as the issuing carrier.

b.   Estimated premium taxes applicable under this program.

c.   Its acceptance of Union International as the program reinsurer.

d.   Acceptance and confirmation of * * * [petitioner] as the authorized program administrator with total claim settlement authority.

e.   The specific documentation required to be given to shippers electing coverage under this program.

On April 27, 1983, Mr. Corde sent a letter to Mr. Robert Sargent of Travelers Insurance Co. (Travelers) discussing petitioner's excess value program and requested that Travelers submit a proposal for the excess value program. On May 20, 1983, Mr. Sargent sent a letter to Mr. Corde outlining an alternative for petitioner.

In a letter dated May 7, 1983, to Mr. Corde, Mr. Smetana presented AIGRM's proposal for an excess value program. In the letter, AIGRM proposed that it would issue a single master

insurance contract that would cover the interests of petitioner's shippers. The proposal indicated that the documentation of coverage under such a contract would be identified through a "Service Instruction Agreement" and the declared value entry on the bill of lading. AIGRM's proposal was based upon insurance coverage for values in excess of $100, at a premium charge of 25 cents per $100 of insured value in excess of $100. Among other things, AIGRM proposed that: (a) Premiums be remitted by petitioner to NUF on a monthly basis less any losses paid and loss expense incurred; (b) petitioner administer all claims under the policy on behalf of NUF; and (c) petitioner be responsible for bad debts or uncollectible items since NUF had no control over the payment of premiums by shippers. Hall found the AIGRM proposal to be more reflective of petitioner's requirements than the Traveler's proposal and submitted the AIGRM proposal as its recommendation for review by petitioner's management.

NUF prepared a "binder of insurance" under which it described the insured as "United Parcel Service of America, Inc. on behalf of its customers, shippers, consignees or other interested parties, as Their Interest may Appear." The binder described the insurance as "Shippers Interest". The rate or premium under the binder was set at 25 cents per $100 of declared value, and the insurance would become effective as of August 8, 1983.

However, on August 8, 1983, Mr. Corde sent a telex to Mr. Smetana which stated:

> [PETITIONER] HAS POSTPONED FINALIZATION OF SHIPPERS INTEREST PROGRAM PENDING THEIR REVIEW AND EVALUATION OF NEW TAX LEGISLATION CURRENTLY ON THE FLOOR OF THE HOUSE OF REPRESENTATIVES WHICH WE UNDERSTAND CAME [sic] OF COMMITTEE END OF LAST WEEK.  WILL KEEP YOU COMPLETELY APPRISED OF THE DEVELOPMENTS AS THEY OCCUR.

Petitioner and AIG continued to work together in planning petitioner's Shippers Interest Program.  On October 25, 1983, Mr. Corde of Hall sent Mr. Smetana of AIG a letter which, among other things, proposed that changes be made to the wording of petitioner's service explanation.

Petitioner's service explanation is a document regularly provided by petitioner to its customers as part of a kit containing other documents, upon commencement of the relationship, upon request by customers, and upon other occasions.  Service explanations were generally available to petitioner's walkup customers upon request.

As of November 1983,[14] petitioner's service explanation

stated:

> Unless a greater value is declared in writing on the
> pickup record, the shipper declares the released value
> of each package or article not enclosed in a package,
> to be $100.  For each $100 or fraction thereof of value
> per package or article not enclosed in a package, in
> excess of $100, an additional charge, as stated on the
> current rate chart, applies.  Except if otherwise
> directed by the shipper, the carrier will remit excess
> valuation charges to National Union Fire Insurance
> Company of Pittsburgh, PA as a premium for excess
> valuation cargo insurance for the shipper's account and
> on its behalf.  When the carrier does so, claims for
> loss of or damage to the shipper's property will be
> filed with and settled by the carrier on behalf of the
> insurance company.  In the event that the insurance
> company fails to pay any claim for loss of or damage to
> the shipper's property under the terms of its policy,
> the carrier will remain liable for loss or damage
> within the limits declared and paid for.  Shippers
> Interest Policy IMB9310977 is available for inspection
> at the office of the carrier.  Claims not made within
> nine months after receipt by the carrier of the
> merchandise shall be deemed waived.

In December 1983, petitioner circulated to its shippers an

edition of its quarterly newsletter entitled "Roundups".  Within

the December Roundups, petitioner informed its shippers that

---

[14]This service explanation was used throughout 1984.
Petitioner's service explanations, as revised in 1986 and 1988,
contained similar wording.  These revisions both stated that
petitioner remained liable for loss or damage.  However, the 1986
and 1988 revised service explanations state that petitioner "may"
remit EVC's to NUF as opposed to the "will remit" language in the
above excerpt.  We note that the "may remit" language of the 1986
and 1988 revisions is the same language used in petitioner's
tariff.  We also note that the "will remit" language in the
November 1983 service explanation could not have been effective
in 1983 since the NUF contract itself does not purport to apply
before January 1984.

petitioner intended to make permanent the practice of allowing its drivers to leave packages at certain specified locations without a signature. With respect to the delivery of packages without the normal signature, petitioner stated the following in its newsletter:

> [Petitioner] also will continue to assume liability for lost and damaged packages up to $100, or the declared value. It might seem that leaving packages even in safe places risks theft, weather damage, denial of delivery or other types of losses. Actually, claims for lost and damaged packages declined in Indiana and Iowa where we've had the most experience with the program.

On December 28, 1983, representatives of AIG and NUF signed an insurance policy, entitled "Shippers Insurance"[15] and numbered IMB 9310977, on behalf of NUF which listed the name and address of the insured as follows:

> NAME AND ADDRESS OF INSURED
>
> Shippers, Consignees, Customers or other interested parties, as their interest may appear with regard to parcels shipped via United Parcel Service of America, Inc. and/or its subsidiaries as now or hereafter constituted (herein after referred to as UPS)
> 643 West 43rd Street
> New York, New York

The address listed under the name and address of the insured served as petitioner's world headquarters. The contract was for a term from January 1, 1984, until canceled. NUF issued the

---

[15]For reasons explained in our opinion, we will refer to the agreement between petitioner and NUF as the Shippers Interest contract.

contract in the State of New York with the understanding that it was pursuant to the free trade zone legislation, article 63 of the New York Insurance Law.

Clause 2 of the Shippers Interest contract states:

[Petitioner] will provide space on its "Pick-Up Record" which will be labeled "Declared value if in excess of $100.00". A declared value indicated by the Named Insured in the space provided shall evidence the existence and the amount of this insurance subject to limits of liability provided herein. This insurance shall not apply unless a declared value is indicated by the Named Insured in the space provided in * * * [petitioner's] "Pick-up Record".

Clause 6 of the Shippers Interest contract generally provided that NUF was not liable for the first $100 of the value of the property, and in no event did NUF's liability exceed the declared value for surface shipments and a maximum of $25,000 per package for air shipments. The cancellation provision of the contract stated:

This policy may be cancelled [sic] by the Named Insured or * * * [petitioner] on behalf of the Named Insured by mailing to the Company written notice stating when thereafter such cancellation shall be effective. This Policy may be cancelled [sic] by the Company by mailing to the Named Insured or * * * [petitioner] at the address shown in this Policy or last known address notice stating when not less than thirty (30) days thereafter such cancellation shall be effective. * * *

Under this provision, petitioner had the power to cancel the Shippers Interest contract.

Clause 20 of the Shippers Interest contract addressed other insurance and stated:

If there is any other insurance covering the property insured hereunder, or * * * [petitioner's] liability, if any, whether prior, subsequent to, or simultaneous with this policy, which in the absence of this insurance would cover the loss, damage or liability hereby covered, then this Company shall not be liable hereunder for more than the excess over and above such other insurance. This clause, however, shall not apply to insurance effected by a Named Insured, and the existence of such insurance, or payment of a loss thereunder, shall not constitute a defense of any claim otherwise payable under this Policy, nor shall such insurance be called on to contribute to any loss payable hereunder.

Under clause 20, NUF was not liable in the event that petitioner's liability for loss or damage to a shipper's package was covered by another insurance policy unless the other policy was "effected" by a shipper.

### (3) Affiliated FM Insurance Policy

Petitioner maintained an insurance policy with Affiliated FM Insurance Co. (AFM policy). The AFM policy was issued on December 27, 1982, and provided coverage from October 1, 1982 to 1985. The AFM policy insured petitioner's property and liability for, among other things, petitioner's interest in the "real and personal property of others, including parcels held for delivery and in transit for which petitioner may be liable or for which the * * * [petitioner] may assume liability or agree to insure prior to loss affected thereby." The AFM policy contained a $100 million liability limitation with sublimits. The AFM policy had a $10 million limit "on Personal Property while in the course of

transportation as respects loss or damage arising out of any one occurrence" and a deductible clause that excluded the first $25,000 of claims arising out of any one occurrence from coverage.

On December 28, 1983, an endorsement was added to the AFM policy, which became effective January 1, 1984. The endorsement stated:

> Permission is hereby granted to insure the deductible amount (25,000.00) applicable to coverage 1B. Personal Property while in the course of transportation. If such property is also insured under policy #IMB-9310977 issued by the National Union Fire Insurance Company of Pittsburgh, PA, and any renewals, or rewrites thereof, it is agreed that any such insurance shall be ignored in determining the amount of loss to which such deductible amount applies. It is also agreed that thirty (30) days advance notice of cancellation shall be given to National Union Fire Insurance Company of Pittsburgh, PA. Any claims presented that exceeds $25,000.00 National Union agrees to abide with our settlement of such claims.

Petitioner paid annual installment premiums of $356,945 for coverage of all petitioner's real and personal property, including parcels held for delivery and in transit. The annual premium was based on property values and stated rates. The AFM policy provided a calculation for the annual premium which operated to apportion $86,820 of the total annual installment premium to property value related to parcels in transit.[16]

---

[16]The $86,820 premium attributable to parcels was computed by multiplying the average daily value of parcels of $354,369,000

(continued...)

### (4)  UPSINCO, Ltd./OPL

On June 9, 1983, pursuant to petitioner's plan, Hall, through Parker & Co.-Interocean, Ltd. (Parker & Co.),[17] prepared a summary of a proposal to organize an insurance subsidiary domiciled in Bermuda under the name UPSINCO, Ltd. (UPSINCO).  By a memorandum dated June 13, 1983, Mr. Corde provided to Mr. Johnson copies of the forms filed with the Registrar of Companies in Bermuda relating to the incorporation of UPSINCO.

On June 23, 1983, a meeting was held which the following persons attended:  Messrs. Danielewski, Johnson, and Jerome Stein representing petitioner; Messrs. Garrity, Corde, and John Iacono representing Hall; Messrs. Robin Spencer Arscott and Geoffrey Hunt of Hall-Bermuda; and Messrs. Chet Butterfield and John Ellison of the Bermuda law firm of Conyers, Dill & Pearman. Among other things, the purpose of the meeting was to discuss various aspects of the Shippers Interest program including the contract form, documentation/ certification, service instruction agreement, monthly bordereaux,[18] and premium/loss reports.

---

[16](...continued)
times the rate of .0245 percent.  The average daily value equaled the average parcel value of $80 times the annual total parcels of 1,616,809,741 divided by 365.

[17]Parker & Co. is a wholly owned subsidiary of Hall.

[18]Petitioner's bordereau is a statement which summarizes, by State, the units of excess value purchased by shippers and the
(continued...)

UPSINCO was incorporated in Bermuda as a wholly owned subsidiary of petitioner on June 28, 1983.  UPSINCO was registered as an exempted company pursuant to the provisions of section 13 of the Companies Act of 1970, under the laws of Bermuda.  On June 28, 1983, the first meeting of the provisional board of directors of UPSINCO was held.  The provisional directors of UPSINCO were listed as Messrs. John A. Ellison, director, C.F.A. Cooper, and N.B. Dill, Jr.  UPSINCO was incorporated with initial capital of $1.2 million and had 12 million shares of capital stock.  Initial ownership of the stock of UPSINCO was as follows:

| Name | No. of Shares |
|------|---------------|
| United Parcel Service of America, Inc. | 1,199,994 |
| Walter E. Danielewski | 1 |
| Kenneth L. Johnson | 1 |
| Jerome D. Stein | 1 |
| John Ellison | 1 |
| H.C. Butterfield | 1 |
| R.S.L. Pearman | 1 |

On July 14, 1983, the shareholders of UPSINCO held their first general meeting in which they elected a board of directors. The elected board of directors consisted of five people.  Three of the five directors elected, Messrs. Danielewski, Johnson, and Stein, were also employees of petitioner.  The remaining two elected directors, Messrs. Ellison and Butterfield, were

[18](...continued)
claims in excess of $100 paid to petitioner's shippers.

representatives of the Bermuda law firm of Conyers, Dill & Pearman.  The minutes of the first meeting indicate that Messrs. Danielewski and Johnson were, respectively, elected to the positions of president and vice president of UPSINCO.  The minutes further indicate that Mr. Stein was appointed as secretary and treasurer and that Mr. Danielewski was appointed as assistant treasurer.[19]  Thus, the majority of UPSINCO's board of directors and officers were all employees of petitioner.

During the July 14, 1983, meeting, the board of directors of UPSINCO appointed Parker & Co. as manager of the company and passed bylaws which it then submitted to the shareholders for confirmation.[20]  Also on July 14, 1983, the shareholders of UPSINCO confirmed and adopted the bylaws and approved all actions taken by UPSINCO's provisional directors on June 28, 1983, and its directors on July 14, 1983.  On August 1, 1983, UPSINCO was certified as an insurer in Bermuda by the Minister of Finance.

By resolution dated October 31, 1983, the executive committee of the board of directors of petitioner authorized a capital contribution in the amount of $41,017,575 in cash to UPSINCO.  In addition, the executive committee of the board of

---

[19]The minutes also indicate that Mr. A.L. Vincent Ingham was appointed assistant secretary.

[20]As of Jan. 1, 1985, subject to the directions and instructions of OPL, the administrative functions of OPL were provided by Parker & Co., a Bermuda corporation.

directors of petitioner resolved to take all actions necessary to effect a change of the name UPSINCO to Overseas Partners, Ltd. (OPL).

By resolution on November 3, 1983, the board members of UPSINCO increased the authorized share capital of the company by $15,687,030, from $1.2 million to $16,887,030, through the creation of an additional 156,870,300 shares of capital stock at 10 cents par value. The members of UPSINCO further resolved that the sum of $25,330,545 be accepted as contributed surplus, resulting in an increase of $41,017,575 in UPSINCO's capital to $42,217,575.

On November 14, 1983, petitioner made a capital contribution of cash in the amount of $41,017,575 to UPSINCO. On November 17 and 18, 1983, petitioner's board of directors declared a dividend of 1 share of OPL (then known as UPSINCO) capital stock on each outstanding share of petitioner's stock (excluding petitioner's shares held in treasury) payable on December 31, 1983, to shareholders of record on November 18, 1983.

On November 23, 1983, the board members of UPSINCO resolved that the name of the company be changed to OPL. By resolution dated November 25, 1983, petitioner's board of directors changed the name of UPSINCO to OPL.

On December 28, 1983, NUF and OPL entered into a Facultative Reinsurance Agreement (agreement) under which NUF agreed to cede

its liability under the Shippers Interest contract to OPL as reinsurer. Under the terms of the agreement, NUF was required to remit to OPL 100 percent of the gross amounts received from petitioner under the Shippers Interest contract less: (a) A commission to NUF of 1.18 percent of the gross premiums not to exceed $1 million; (b) an allowance of 3.1 percent of the gross premiums written to cover NUF's premium tax and board and bureau charges; and (c) 1 percent of the gross premiums for the purpose of paying Federal excise taxes. In addition, under article IX of the agreement, NUF held as security an amount equal to the first 2 months of gross premiums written less commission, taxes, board and bureau charges, losses paid, loss expenses paid, and Federal excise taxes, if any.

The agreement became effective on January 1, 1984, and remained in effect until canceled or terminated. The termination provision of the agreement stated:

> Neither the Company nor Reinsurer may terminate this Agreement while the Policy listed in Article I Item B is in force; however, if the Policy listed in Article I Item B[21] is in fact terminated then in that event and that event only this Agreement shall be terminated simultaneously therewith. * * *

Under this provision, neither NUF nor OPL could cancel the agreement while the Shippers Interest contract remained in force.

---

[21]Article I Item B lists only the Shippers Interest contract between petitioner and NUF.

On December 31, 1983, petitioner made a distribution, which it treated as a taxable dividend to its shareholders, of 1 share of OPL stock for each share of petitioner's stock then outstanding. Petitioner distributed 164,477,491 shares of OPL stock with a net asset value of 25 cents per share. The total dividend was $41,119,372.75. The fair market value of the OPL capital stock received by each of petitioner's shareholders was considered by petitioner to be ordinary income to each of petitioner's shareholders.

In 1983, petitioner was owned by its active employees and former employees, as well as the families, estates, and trusts of former employees. In 1983, there were approximately 14,000 shareholders. On December 31, 1983, as of the moment of distribution of the OPL stock, the shareholders of OPL were essentially the same as petitioner's shareholders. The only difference between the shareholders of OPL and petitioner's shareholders was that petitioner's shareholders did not receive the same proportionate interest in OPL that they owned in petitioner because petitioner itself was a shareholder of OPL.

On December 31, 1984, there were 14,811 shareholders in OPL holding an aggregate of 164,358,562 shares of common stock, not including the 4,511,738 treasury shares of OPL owned by petitioner. The total shares in OPL equaled 168,870,300. On December 31, 1984, there were 16,297 shareholders in petitioner

holding an aggregate of 163,182,028 shares of common stock.  The
4,511,738 shares of OPL owned by petitioner represented 2.67
percent of the 168,870,300 shares in OPL on December 31, 1984.

During the years in issue, restrictions applied in the event
an OPL shareholder wanted to sell shares of OPL.  No outstanding
shares of OPL capital stock were transferable, except by gift or
inheritance, unless the shares were first offered for sale to
petitioner at the lower of the net book value of the OPL stock or
at the price and terms at which the OPL stock was offered to the
proposed transferee.  OPL shareholders were required to notify
petitioner's treasurer of the number of shares proposed to be
sold, the proposed price per share, the name and address of the
proposed transferee, and the terms of the proposed sale and
provide a statement of the proposed transferee that the
information contained in the notice was true and correct.  OPL
shareholders had the right to pledge OPL stock but were not
allowed to transfer the stock upon foreclosure without
petitioner's having first been offered the option to purchase the
stock.

### 2.  1984 and Years Following

#### a.  General

For the taxable year ending December 31, 1984, excess value
amounts billed to regular shippers and collected from other
shippers were not included in petitioner's reported taxable

income.  Petitioner did not include excess value amounts billed to regular shippers in its filings with the SEC and the ICC for the year ended December 31, 1984.  Otherwise, petitioner's activities with respect to the excess value activity basically remained the same as in prior years.  Petitioner continued to bill customers for shipping charges on the basis of information recorded by shippers on the package pickup records.  The bills reflected all amounts to be collected from shippers, including EVC's.  All amounts collected, including EVC's, from the shippers were deposited in petitioner's bank accounts.  Petitioner continued to process all claims for loss or damage to parcels, including any excess value portions of the claims.  If a claim for loss or damage was paid, petitioner continued to remit the amount for the claim by check to the shipper.

Petitioner did not apply for, and did not hold, an insurance license of any type.  During 1984, petitioner's employees who processed shippers' claims were not licensed as claims adjusters in the States in which they processed claims.  NUF did not participate in the resolution of specific claims in 1984, challenge the amounts of specific loss claims paid by petitioner, or challenge the amounts of loss and damage claims that petitioner subtracted from the amounts that it remitted to NUF during 1984 in connection with NUF contract IMB 9310977.

b.    Accounting

For the taxable years ended December 31, 1983 and 1984, UPS-New York and UPS-Ohio were required to file annual reports with the ICC and were required to follow the rules of accounting and use the accounts established by the ICC in connection with ICC accounting and reporting requirements.  Petitioner was also required to follow Generally Accepted Accounting Principles.  For financial accounting and managerial reporting purposes, petitioner used a system of accounts that was generally the same as the ICC system of account numbers.  However, petitioner's expense accounts are much more detailed than ICC expense accounts used for ICC accounting purposes.

With respect to a shipment made by a regular customer, there was no change in the method in which journal entries were made in 1983 and 1984.  Petitioner generally debited accounts receivable and credited an intercompany account.  When petitioner received the EVC amounts from its shippers, the amounts were deposited in petitioner's bank accounts.  Petitioner paid shippers' claims out of corporate bank accounts.

Petitioner did make changes to its internal accounting worksheets at its district level in 1984.  The worksheets detailed the EVC's differently in 1984 than in 1983.  However, petitioner's accounting journal entries were the same in 1984 as they were in 1983 at the district level.

c. Transactions Between Petitioner and NUF

Beginning in January 1984, petitioner transferred excess value amounts billed to its regular shippers and collected from other shippers, net of claims paid in excess of $100, to NUF on a monthly basis. Petitioner did not receive reimbursement or compensation from NUF for generating, billing, and collecting EVC's or for processing the excess value claims.

In 1984, petitioner began preparing a "bordereau" statement which summarizes, by State, the units of excess value purchased by shippers and the claims in excess of $100 paid to petitioner's shippers. The bordereau statement reflects total amounts transferred by petitioner to NUF during 1984 as follows:

| Month | Gross Premium | Claims Paid | Net Premium |
|-------|--------------|-------------|-------------|
| Jan. | $6,441,266.73 | $67,764.74 | $6,373,501.99 |
| Feb. | 8,872,879.29 | 493,372.97 | 8,379,506.32 |
| Mar. | 8,204,394.80 | 1,152,402.35 | 7,051,992.45 |
| Apr. | 7,543,896.37 | 1,537,670.65 | 6,006,225.72 |
| May | 7,564,372.78 | 1,945,900.71 | 5,618,472.07 |
| June | 9,287,618.30 | 2,086,223.87 | 7,201,394.43 |
| July | 6,999,418.50 | 1,970,519.97 | 5,028,898.53 |
| Aug. | 9,998,146.19 | 2,367,289.23 | 7,630,856.96 |
| Sept. | 8,034,914.33 | 2,098,262.38 | 5,936,651.95 |
| Oct. | 8,522,263.90 | 2,887,865.46 | 5,634,398.44 |
| Nov. | 10,600,501.16 | 2,922,216.00 | 7,678,285.16 |
| Dec. | 7,725,117.32 | 2,554,523.60 | 5,170,593.72 |
| Total | 99,794,789.67 | 22,084,011.93 | 77,710,777.74 |

The category "Net Premium" represents EVC's billed to petitioner's regular customers and collected from other shippers from each of the States and the District of Columbia, less claims

over $100 remitted to petitioner's shippers during the month. Generally, around the middle of the month following billing to regular shippers or collection from walk-in shippers, the net amounts were remitted by wire transfers from petitioner's account to an NUF account. No interest on excess value amounts that had been collected before the excess value amounts were transferred to NUF was paid to NUF. During 1984, if a shipper did not pay a bill that included declared excess value amounts, petitioner did not reduce the amount transferred to NUF. If collection activities occurred, petitioner attempted to collect the entire amount due from the shipper, including any EVC's included in the bill. Petitioner did not reduce the amount transferred to NUF by any amount uncollected or any cost it incurred in collecting delinquent EVC's.

### d.  Transactions Between NUF and OPL

Beginning in January 1984, after receiving the amounts remitted to NUF by petitioner, NUF prepared a bordereau and remitted the net amounts shown on NUF's bordereau to OPL by wire transfer. The following table summarizes the amounts and dates of transfers made by NUF to OPL relating to excess value amounts during 1984:[22]

---

[22]The amounts shown in the table were rounded, resulting in minor discrepancies of a few dollars.

| Month | Net[1] Premiums | Under-writing Expenses | Taxes Boards & Bureaus[2] | Funds Withheld[3] | Interest on Funds Withheld | Net Payment to OPL[4] |
|---|---|---|---|---|---|---|
| Jan. | $6,373,502 | $76,007 | $264,092 | $6,033,403 | -0- | -0- |
| Feb. | 8,379,506 | 104,700 | 363,788 | 7,911,018 | $45,453 | $45,453 |
| Mar. | 7,051,992 | 96,812 | 336,380 | -0- | 113,879 | 6,732,679 |
| Apr. | 6,006,226 | 89,018 | 309,300 | -0- | 142,349 | 5,750,256 |
| May | 5,618,472 | 89,260 | 310,139 | -0- | 113,879 | 5,332,953 |
| June | 7,201,394 | 109,594 | 380,792 | -0- | 113,879 | 6,824,888 |
| July | 5,028,899 | 82,593 | 286,976 | -0- | 146,416 | 4,805,745 |
| Aug. | 7,630,857 | 117,978 | 409,924 | -0- | 109,812 | 7,212,767 |
| Sept. | 5,936,652 | 94,812 | 329,431 | -0- | 142,349 | 5,654,758 |
| Oct. | 5,634,399 | 100,563 | 349,413 | -0- | 113,879 | 5,298,302 |
| Nov. | 7,678,285 | 38,663 | 434,621 | -0- | 113,879 | 7,318,880 |
| Dec. | 5,170,594 | -0- | 316,730 | -0- | 126,081 | 4,979,945 |
| Total | 77,710,778 | 1,000,000 | 4,091,586 | 13,944,421 | 1,281,855 | 59,956,626 |

[1]This column was arrived at by netting gross income and losses paid.
[2]This column contains the total amounts included on the bordereau for taxes, board and bureau charges, and Federal excise taxes.
[3]In 1984, the net amounts to be remitted by NUF to OPL for January and February were withheld in escrow by NUF.
[4]The "Net Payment to OPL" is calculated by reducing the net premiums shown in column one by expenses, taxes, board and bureau charges, and funds withheld and by increasing that amount by interest on funds withheld.

NUF paid Hall $250,000 from the $1 million it received from petitioner as fees. OPL ultimately recorded the funds received in its general ledger.

C. FFIC/PIP

Fireman's Fund Insurance Co. (FFIC), through a policy sold by Parcel Insurance Plan, Inc. (PIP), since 1966, offered excess value protection for shipments sent via petitioner, the U.S. Postal Service, and other carriers. Most of FFIC/PIP's business came from petitioner's shippers. PIP tried to solicit business from petitioner's shippers who spent at least $1,000 annually for

EVC's.  Generally, PIP charged 50 percent of the rate charged for the excess value coverage offered by petitioner to its shippers. This amounted to a price of $0.125 per $100 of coverage.

PIP declined to provide coverage to certain high-risk shippers and also declined to provide coverage on certain types of packages.  However, PIP's marketing materials indicate that shippers in industries with serious theft problems could still participate, but they were charged more than $0.125 per $100 of coverage.  If such a shipper were accepted by PIP, PIP would charge between $0.15 and $0.175 per $100 of coverage.

FFIC was responsible for payment of losses and reimbursed PIP weekly for loss claims paid.  For the years 1983 and 1984, PIP's profit margins equaled 36 percent and 34 percent, respectively.  PIP paid approximately 64 percent and 66 percent for 1983 and 1984, respectively, of the amounts collected to FFIC for the parcel protection.  For 1983, FFIC's gross profit margin equaled 27 percent of the premium written.[23]

II.  Liberty Mutual Insurance Policy

A.    Insurance Policy Between Petitioner and Liberty Mutual

Liberty Mutual is a group of mutual insurance companies. Liberty Mutual are multiline property and casualty insurers based in Boston, Massachusetts, which operate in all 50 States and the

---

[23]The "profit margin" is equal to premiums minus claims paid minus commissions.

District of Columbia, Canada, and the U.S. Virgin Islands. Liberty Mutual Fire Insurance Co. (Liberty Mutual Fire) is a member of Liberty Mutual.

Liberty Mutual wrote workers' compensation insurance in all States except those that were "monopolistic". In the eight "monopolistic" States, only one State-affiliated company was permitted to write workers' compensation policies. In 1984, workers' compensation policies accounted for 39.3 percent of Liberty Mutual Fire's net premiums. In 1984, Liberty Mutual Fire wrote workers' compensation policies in California. California law prohibited insurance policies for California workers' compensation risks from also insuring workers' compensation risks for other States. Thus, a California workers' compensation policy was always a "stand-alone" policy.

The initial premium for a workers' compensation policy in California was determined by a statutory formula which took account of the estimated payroll for each job classification. However, an employer's loss experience could also affect the premium if the employer received an "experience modification" from the State of California. Generally, California law permits the payment of dividends by a mutual insurance company but prohibits any individual or insurance company from promising the future payment of dividends under an unexpired workers' compensation policy or misrepresenting the conditions for

dividend payment.  See Cal. Code Regs. tit. 10, sec. 2504 (1999).

From 1979 through 1983, petitioner self-insured its workers' compensation risks in California.  R.L. Kautz, a company unrelated to petitioner or Liberty Mutual, administered this program.  Liberty Mutual wrote the workers' compensation insurance for petitioner in all other States that were not monopolistic during this period.

Any employer in California seeking to be self-insured for workers' compensation must submit an application to the State and obtain State approval.  Any employer seeking to change from a self-insured to an insured program for workers' compensation must also submit an application to California and obtain State approval.

On October 3, 1983, Mr. Eugene Schoenleber of petitioner's insurance department requested that Mr. Al Sharlun submit a proposal for taking over the administration of petitioner's California workers' compensation program from R.L. Kautz.  Mr. Sharlun worked in Liberty Mutual's national sales department, which handles large national accounts.  Subsequently, petitioner and Liberty Mutual agreed that Liberty Mutual would write an insurance policy for petitioner's 1984 California workers' compensation liability.

On December 15, 1983, the State of California sent a letter to petitioner reflecting its understanding that it was the

intention of petitioner to withdraw from workers' compensation self-insurance status in California.  On December 28, 1983, petitioner sent a letter to the State of California confirming that Liberty Mutual Fire was taking over the management of all open and closed self-insurance claims from 1979 through 1983.

The State of California granted petitioner's application to terminate its self-insurance plan.  As of January 1, 1984, petitioner and Liberty Mutual entered into an insurance policy with respect to petitioner's 1984 California workers' compensation liability.  Petitioner was listed as the insured. The policy was issued by Liberty Mutual Fire and was a permissible workers' compensation policy in the State of California.  As part of the agreement, Liberty Mutual Fire was required to investigate and adjust all claims made under the policy.  The policy provides coverage for compensation and other benefits required of petitioner by the workers' compensation laws of California and provides coverage for all sums which petitioner is legally obligated to pay as damages because of bodily injury or accident or disease, including death arising out of the course of employment.

Under the Participating Provision Endorsement of the insurance policy, petitioner was designated a member of Liberty Mutual, with a right to participate in the distribution of dividends.  Dividends were determined by the board of directors

of Liberty Mutual.  This endorsement provided that the policy was nonassessable.  As a nonassessable policyholder, petitioner could not be assessed for Liberty Mutual's losses and expenses in excess of the premiums paid for the 1984 California workers' compensation policy.  The Participating Provision Endorsement also reiterated the statutory provision in California which made it unlawful for Liberty Mutual to promise the future payment of dividends before the expiration of the 1984 policy period, and the endorsement noted that dividends are payable only as determined by the board of directors of Liberty Mutual following the expiration.

The policy also contained a Redetermination Agreement Endorsement which provided that an initial apportionment of dividends may be made from a surplus accumulated from the California workers' compensation insurance following termination of the policy.  Further, the policy provided that if a subsequent dividend is greater than the dividend previously paid to petitioner, Liberty Mutual shall pay to petitioner the additional dividend shown to be due.  However, if the subsequent dividend is less than the dividend previously paid to petitioner, petitioner shall refund the amount by which the previous dividend exceeds the current dividend.

The audited premium for the policy is based upon actual payroll amounts during the policy period for various job

classifications, multiplied by a standard rate set by the State for each classification, and further multiplied by an experience modification factor. The estimated modified annual premium is the amount initially paid to Liberty Mutual Fire, which is determined based upon estimates of payroll amounts for the year. After the end of the year, the audited modified premium is determined based upon the final payroll figures for the year.

Under the policy, Helmsman Management, a subsidiary within the Liberty Mutual group, would administer the runoff of the 1979 through 1983 workers' compensation self-insurance plan for petitioner beginning in 1984 for a flat fee of $250,000. Liberty Mutual charged petitioner 12 percent of its workers' compensation losses, subject to a maximum of $1.2 million, for the cost of handling the workers' compensation claims. Liberty Mutual charged petitioner 1 percent of its audited premium for excise tax and 1 percent for management fees. Dividends were to be declared and paid in accordance with California law and the determinations of the board of directors of Liberty Mutual.

In 1984, petitioner made premium payments to Liberty Mutual in connection with the California workers' compensation policy and received a dividend payment in 1985. During 1984, petitioner also continued to insure its workers' compensation liability for most other States with Liberty Mutual. In April 1984, the estimated premium for petitioner in California was calculated to

be $14,241,915.  The $14,241,915 estimated premium was paid to Liberty Mutual by petitioner in monthly installments in 1984.  By April 1, 1985, Liberty Mutual completed its audit of the hours worked by various classes of petitioner's employees in California and determined the audited premium.  After the audit, the standard premium for petitioner was increased by $204,496 to reflect the actual amounts of petitioner's California payroll for the year 1984.

In October 1985, Liberty Mutual Fire sent petitioner a statement showing the first dividend adjustment to the Liberty Mutual policy.  Every year thereafter through 1994, an annual dividend statement was sent to petitioner reflecting further dividend readjustments to the policy.

B.   Liberty Mutual-OPL Reinsurance Treaty

Effective January 1, 1984, Liberty Mutual and OPL entered into a reinsurance treaty for petitioner's 1984 California workers' compensation liability, which was the subject of the Liberty Mutual policy.  Pursuant to the agreement, in 1984 Liberty Mutual:  Paid OPL $12,228,077.62 in premiums in monthly installments; retained a ceding commission of $1.2 million; withheld and created an escrow of $480,000 to cover OPL's liability for losses paid by Liberty Mutual; paid a Federal excise tax of $141,919.15; and retained a management fee of $141,918.23.

The agreement, with respect to OPL's reinsurance of Liberty Mutual includes but is not limited to the following terms:

1.  OPL reinsured Liberty Mutual's UPS California workers' compensation exposure for losses not exceeding $250,000 from any one accident.  Liberty Mutual retained the exposure for losses exceeding $250,000 from any one accident.  Liberty Mutual also retained the risk of multiple accidents with losses in excess of $250,000.

2.  Liberty Mutual Fire agreed to pay over to OPL an amount equal to the premiums received on the California workers compensation policy, less $50,000 for the retained layer of liability for losses above $250,000, a management fee equal to 1 percent of the premium, 1 percent of the premium for excise tax, and a ceding commission equal to 12 percent of the losses incurred.  The ceding commission was capped at $1.2 million.

3.  Liberty Mutual retained the obligation to investigate and adjust all claims for the UPS workers' compensation program in California.

4.  Liberty Mutual paid a 1 percent excise tax on reinsurance by a foreign insurer, pursuant to I.R.C. section 4371.

C.   Amount in Dispute

On its 1984 Federal income tax return, petitioner deducted the estimated premium of $14,241,915 it paid to Liberty Mutual

for California workers' compensation coverage.  By December 31, 1984, petitioner had incurred workers' compensation losses in California that had been paid by Liberty Mutual in the amount of $2,714,500.  Respondent disallowed $11,527,415[24] deducted on petitioner's 1984 return.  After concessions, the amount in dispute with respect to the Liberty Mutual policy has been reduced to $11,151,675.[25]

OPINION

I.   Excess Value Charges

Respondent determined that EVC's in the amount of $99,794,790 must be included in petitioner's 1984 income pursuant to section 61.  Section 61(a) provides in part that "gross income means all income from whatever source derived".  It is fundamental to our system of taxation that income must be taxed to the one who earns it.  See Commissioner v. Culbertson, 337

---

[24]This amount represents the difference between the total of $14,241,915 of deductions and the $2,714,500 actually paid out by Liberty Mutual Fire in 1984 claims.

[25]Respondent conceded a total of $375,740.  See supra note 2.  Thus, respondent's initial disallowance of $11,527,415 has been reduced by $375,740 to $11,151,675.  The $375,740 conceded by respondent is made up of $325,740, representing a 12-percent claim adjustment expense for losses paid in 1984 plus $50,000 in premiums paid to Liberty Mutual for risk associated with claims over $250,000.

The $325,740 conceded amount was calculated by respondent to be an allocation of a portion of the total $1.2 million retained by Liberty Mutual based on the ratio of 1984 claim payments to total 1984 claims paid between 1984 and 1994.

U.S. 733, 739-740 (1949).  The incidents of taxation cannot be avoided through an anticipatory assignment of income.  See United States v. Basye, 410 U.S. 441, 447, 449-450 (1973); Lucas v. Earl, 281 U.S. 111, 114, 115 (1930).  This has been described as "the first principle of taxation".  Commissioner v. Culbertson, supra at 739.  The question of who should be taxed depends on which person or entity in fact controls the earning of the income rather than who ultimately receives the income.  See Commissioner v. Sunnen, 333 U.S. 591, 604-606 (1948); Corliss v. Bowers, 281 U.S. 376, 378 (1930); Vercio v. Commissioner, 73 T.C. 1246, 1253 (1980); see also Ronan State Bank v. Commissioner, 62 T.C. 27, 35 (1974); American Sav. Bank v. Commissioner, 56 T.C. 828 (1971); Nat Harrison Associates, Inc. v. Commissioner, 42 T.C. 601 (1964).  A taxpayer realizes income if he controls the disposition of that which he could have received himself but diverts to another as a means of procuring the satisfaction of his goals.  The receipt of income by the other party under such circumstances is merely the fruition of the taxpayer's economic gain.  See Commissioner v. Sunnen, supra at 605-606; Helvering v. Horst, 311 U.S. 112, 116-117 (1940).

Respondent does not, and need not, challenge OPL's separate existence as a valid corporate entity.  The classic assignment of income cases involve persons and entities whose separate existence was unquestioned.  See United States v. Basye, supra;

Lucas v. Earl, supra; Leavell v. Commissioner, 104 T.C. 140 (1995). The Supreme Court's articulation of the assignment of income doctrine requires no challenge to the separate existence of the persons or entities to which the doctrine applies. As the Court stated:

> The entity earning the income--whether a partnership or an individual taxpayer--cannot avoid taxation by entering into a contractual arrangement whereby that income is diverted to some other person or entity. Such arrangements, known to the tax law as "anticipatory assignments of income," have frequently been held ineffective as means of avoiding tax liability. * * *  [United States v. Basye, supra at 449-450.]

Therefore, the issue we must decide is whether petitioner, rather than NUF and OPL, earned the EVC's.

During the years prior to 1984, petitioner properly reported revenues from EVC's as income for Federal income tax purposes. During those years petitioner performed the following EVC functions and activities:

1. Maintained and advertised the shipping activity, which provided a customer base for petitioner's excess value activity.

2. Printed shipping forms with an excess value election.

3. Published excess value rates in tariffs.

4.  Incurred liability for damage or loss to packages in excess of $100 when the shipper declared such excess value and paid an EVC.[26]

5.  Billed shippers for EVC's.

6.  Collected EVC's.

7.  Deposited EVC's into petitioner's bank accounts.

8.  Retained interest paid on EVC income held in petitioner's accounts.

9.  Processed excess value claims.

10. Investigated excess value claims.

11. Traced lost parcels.

12. Inspected damaged parcels.

13. Paid excess value claims.

14. Maintained a "loss prevention" manual and personnel to audit and implement it.

15. Defended against lawsuits brought by shippers whose excess value claims had been denied.

16. Incurred all costs associated with the administration of its excess value activity.

17. Obtained and paid for catastrophic insurance to cover its liability for lost or damaged shipments.

---

[26]Petitioner accepted liability for damage or loss to packages up to $100 and made payment for such loss or damages.

After January 1, 1984, petitioner continued to perform all these functions and activities.  This continuity in petitioner's EVC activity after January 1, 1984, was consistent with a plan petitioner had formulated during 1983.

During 1983 petitioner asked AIG to submit a proposal for restructuring petitioner's excess value program.  AIG's proposal contemplated that NUF would perform in a "fronting" capacity; a capacity in which NUF would receive excess value income under the Shippers Interest contract and reinsure its liability under the Shippers Interest contract with OPL.  In his letter dated April 27, 1983, Mr. Corde, of Hall, stated that NUF would exist "in a fronting capacity with essentially no risk or exposure to loss under the program."  NUF retained an even $1 million in 1984 as a fronting service fee for agreeing to reinsure the Shippers Interest contract with OPL.[27]

Mr. Smetana of AIG proposed that petitioner would continue to collect EVC's from shippers, administer and pay all valid claims, and remit excess value amounts to NUF net of claims.  Mr. Smetana also proposed that petitioner be responsible for uncollectible EVC's.  Mr. Smetana reasoned that "since * * *

---

[27]A front has been generally described as an arrangement whereby an insurance company allows another company to use its name for a fee.  See Old Sec. Life Ins. Co. v. Continental Ill. Natl. Bank & Trust, 740 F.2d 1384, 1387 n.2 (7th Cir. 1984); see also Northwestern Natl. Ins. Co. v. Marsh & McLennan, Inc., 817 F. Supp. 1424, 1426 (E.D. Wis. 1993).

[AIG/NUF] would have no control over the payment of premium by shippers, * * * [AIG/NUF] would not take on the responsibility for any bad debt or uncollectables under the program."  These proposals all became part of petitioner's method of operation on January 1, 1984.

Under the Facultative Reinsurance Agreement between NUF and OPL, article I, item B lists the Shippers Interest contract as the policy to be reinsured.  Under article XVIII, subparagraph (A), neither NUF nor OPL could terminate the reinsurance agreement while the Shippers Interest policy remained in force.  Article XVIII further requires that only in the event that the Shippers Interest contract is in fact terminated will the reinsurance agreement between NUF and OPL be terminated simultaneously therewith.  Either petitioner or the "Named Insured" could cancel the Shipper's Interest contract under the terms of that agreement.[28]

Beginning in January 1984, petitioner transferred excess value amounts billed to its regular shippers and collected from other shippers, net of claims paid in excess of $100, to NUF on a monthly basis.  Petitioner did not reduce the amounts transferred to NUF in order to compensate itself for sales and marketing

---

[28]We note that it is unrealistic to conceive of a situation in which a single shipper could cancel the whole Shipper's Interest contract or that all the unrelated shippers in unison could cancel the contract.

expenses that it incurred regarding the EVC's. Petitioner did not charge either NUF or OPL for providing the point of contact with shippers who declared excess value and paid EVC's. No interest on excess value amounts that had been collected before the excess value amounts were transferred to NUF was paid to NUF. During 1984, if a shipper did not pay a bill that included excess value amounts, petitioner attempted to collect the entire amount due from the shipper, including any EVC's included in the bill. Petitioner did not reduce the amount transferred to NUF by any amount uncollected or any cost it incurred in collecting delinquent EVC's. Petitioner also adjusted and paid all claims with respect to lost or damaged shipments. Petitioner also defended against shippers' claims that had been denied. Petitioner did not reduce the amounts it transferred to NUF in order to compensate itself for performing these activities and did not otherwise charge NUF or OPL for performing any of these activities.

Petitioner also continued to provide other services related to EVC's. Petitioner provided "controlled parcel handling" procedures, which were expensive and time consuming. Those procedures included bagging, tagging, and tracking high value packages that had declared values in excess of $100. Petitioner maintained a loss prevention department in which it employed personnel to audit controlled parcel handling procedures. Such

audits took place at petitioner's hub and delivery center operations. Petitioner's special controlled parcel handling procedure with respect to high-value packages constituted extra services for shipments whose declared value exceeded $100. Petitioner did not reduce the amount transferred to NUF in return for performing the controlled parcel handling procedures and did not otherwise charge NUF or OPL for performing these activities.

Before January 1, 1984, petitioner performed all the functions and activities related to the EVC's and was liable for the damage or loss of packages up to their declared value. After January 1, 1984, petitioner continued to perform all the functions and activities related to EVC's, including billing for and receiving EVC's, and remained liable to shippers whose shipments were damaged or lost while in petitioner's possession. Petitioner continued to receive shippers' claims for lost or damaged goods, investigate and adjust such claims, and pay such claims out of the EVC revenue that it had collected from shippers. The difference between petitioner's EVC activity before and after January 1, 1984, was that after that date it remitted the excess of EVC revenues over claims paid, i.e., gross profit, to NUF, which, after subtracting relatively small fronting fees and expenses, paid the remainder to OPL, which was essentially owned by petitioner's shareholders.

The only potentially relevant change that occurred on January 1, 1984, was the introduction of the Shippers Interest contract between petitioner and NUF and the Facultative Reinsurance Agreement between NUF and OPL. Petitioner attempts to justify this arrangement on the ground that it was based on bona fide business considerations and that the arrangement had economic substance. If on the other hand the arrangement with NUF and OPL had neither business purpose nor economic substance, other than tax avoidance, the entire arrangement has all the earmarks of a classic assignment of income wherein petitioner was attempting to assign EVC income that had been earned through its own services and activities to OPL for the benefit of petitioner's and OPL's common shareholders.

On brief, petitioner relies on Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943), for the proposition that it may rearrange, change, and divide business activities among business entities. We agree that, normally, a choice to transact business in corporate form will be recognized for tax purposes as long as there is a business purpose or the corporation engages in business activity. See Northern Ind. Pub. Serv. Co. v. Commissioner, 105 T.C. 341, 347-348 (1995) (citing Moline Properties, Inc. v. Commissioner, supra at 438-439), affd. 115 F.3d 506 (7th Cir. 1997). As previously noted, OPL's separate corporate existence is not being questioned. The issue then is

whether the restructuring of petitioner's EVC activity in 1984 by inserting NUF and OPL as part of the EVC transactions had substance.  If these transactions lack substance, then petitioner engaged in an anticipatory assignment of income and cannot avoid taxation "no matter how clever or subtle" the arrangement. United States v. Basye, 410 U.S. at 450.  While a taxpayer may structure a transaction to minimize tax liability, that transaction must have economic substance if it is to be respected for tax purposes.  See Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986).

The inquiry into whether transactions have sufficient substance to be respected for tax purposes turns on both the objective economic substance of the transactions and the subjective business motivation behind them.  See Kirchman v. Commissioner, supra at 1491-1492;[29] see also ACM Partnership v.

---

[29]In Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989), affg. Glass v. Commissioner, 87 T.C. 1087 (1986), the court observed:

> Courts have recognized two basic types of sham transactions.  Shams in fact are transactions that never occur.  In such shams, taxpayers claim deductions for transactions that have been created on paper but which never took place.  Shams in substance are transactions that actually occurred but which lack the substance their form represents. * * *

Because all the transactions at issue in this case actually
(continued...)

Commissioner, 157 F.3d 231 (3d Cir. 1998), affg. in part and revg. in part on another ground T.C. Memo. 1997-115; Lerman v. Commissioner, 939 F.2d 44, 53-54 (3d Cir. 1991), affg. Fox v. Commissioner, T.C. Memo. 1988-570; Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. in part and revg. in part on another ground Larsen v. Commissioner, 89 T.C. 1229 (1987). The objective and subjective prongs of the inquiry are related factors both of which form the analysis of whether the transaction had sufficient substance apart from its tax consequences. See ACM Partnership v. Commissioner, supra at 247; Casebeer v. Commissioner, supra at 1363.

In making our determination as to whether a transaction has substance, we will first look to whether the taxpayer had a business purpose for engaging in the transaction other than tax avoidance. See Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978); Kirchman v. Commissioner, supra at 1492; Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23. The determination of whether the taxpayer had a legitimate business purpose in entering into the transaction involves a subjective analysis of

---

[29](...continued)
occurred, we limit our inquiry to the question of whether their substance corresponds to their form.

the taxpayer's intent.  See Kirchman v. Commissioner, supra at 1492.

Petitioner argues that it had legitimate business purposes for entering into the arrangement with NUF and OPL, other than tax avoidance.  Petitioner specifically alleges that during 1983 it was seriously concerned that its continued receipt of the excess value income was potentially illegal under various State insurance laws and that it was this concern that motivated it to rearrange its method of handling its EVC activity.  Therefore, petitioner argues, the EVC income cannot properly be considered to belong to petitioner.  Petitioner cites Bank of Coushatta v. United States, 650 F.2d 75 (5th Cir. 1981), as authority.

In Bank of Coushatta v. United States, supra, the taxpayer bank was contesting the imposition of Federal income tax on credit life insurance commissions, which the bank contended were actually earned by one of its executives.  See id. at 76.  The bank had transferred the credit life insurance business to the executive because the bank believed that it would have been illegal for it to continue to earn and receive insurance commissions.  The District Court reasoned that because there was no showing of any kind that the bank ever received the commissions as income under section 61, the bank had not "earned" the income.  See id. at 77.  The Court of Appeals for the Fifth Circuit affirmed on the basis of the District Court's opinion.

However, the Court of Appeals limited its holding to the situation where the bank's decision to transfer the insurance business to the executive was motivated by the good faith belief that it would be illegal for the bank to continue to earn and receive insurance commission income. See id. at 76. Therefore, petitioner's ability to rely on Bank of Coushatta depends on whether petitioner's decision to transfer the excess value income to OPL through NUF was motivated by a good faith concern that it was illegal for petitioner to continue to receive the excess value income. We do not believe that this was petitioner's purpose.

Mr. Kenneth Johnson, head of petitioner's insurance department, testified that in the early 1980's he learned that the collision damage waivers offered by the Hertz and Avis rental car companies were being challenged by State insurance regulators as an illegal insurance business and that this caused him to become concerned that petitioner's excess value activity could be viewed by State insurance regulators as engaging in an unlicensed insurance activity. No State insurance regulators had ever questioned the legality of petitioner's EVC activity, and Mr. Johnson was not aware that any such questions had ever been raised with other carriers. Mr. Johnson testified that, because of his concerns, he had a casual conversation with an

acquaintance, Ms. Yudain, who was an insurance broker who told him that his concerns might have substance.

Both Mr. Johnson and Mr. Corde testified that they met in 1982 and had some discussion regarding the possibility that petitioner's EVC activities might run afoul of State insurance regulations. After Mr. Johnson met with Mr. Corde in 1982, Mr. Corde sent Mr. Johnson a report on September 7, 1982, discussing the feasibility of creating a subsidiary to reinsure declared value risks. The report stated:

> It is our understanding that * * * [petitioner] currently provides its customers with coverage for any parcels lost or damaged up to $100. Those parcels with values in excess of $100 can be declared by the shipper and protection secured at a cost of $.25 per $100 of value. While this protection is not considered to be insurance, it could be converted to insurance and that insurance could be provided by a * * * [petitioner] owned insurance company.

The report contains figures regarding petitioner's EVC revenues, claims, and gross profits and discusses the potential for increasing profits. The report does not discuss problems with State insurance laws.

Mr. Johnson's conversation with Mr. Corde in 1982 appears to be his and petitioner's last inquiry regarding problems with State insurance regulation. Neither Mr. Johnson nor petitioner sought legal advice regarding these alleged concerns. In addition, neither Mr. Johnson nor anyone else on petitioner's staff appears to have made an inquiry as to whether the EVC

program, as proposed to be restructured, might violate State

insurance regulations.  No contemporaneously prepared documentary

evidence was presented to indicate that petitioner had such

concerns or to indicate that petitioner analyzed the alleged

problem and considered the steps necessary to deal with its

alleged concerns.[30]  Mr. Johnson's testimony on cross-examination

is revealing:

> Q.    Your concern about possible state regulation, you
> never discussed this with the [sic] anybody at the ICC, did
> you?
>
> A.    I did not.  No.
>
> Q.    And you're not aware of anybody at UPS ever
> discussing it with anybody at the ICC.
>
> A.    I'm not aware of it.

---

[30]During 1983, Mr. Corde of Frank B. Hall inquired about how
other Hall clients handled cargo coverage in connection with
analyzing the proposed UPS declared value program.  Mr. Doug
Brown of Hall prepared an internal memorandum to Mr. Corde dated
Mar. 2, 1983, outlining the arrangements of other companies which
were Hall clients.  The concluding paragraph of Mr. Brown's
memorandum states:

> In my discussions with Frank B. Hall people and
> underwriters, the opinion with regard to the legality
> of selling shippers interest when in fact neither
> client is a licensed insurance agent was that provided
> the carrier is simply requesting an acceptance or
> declination from the shipper for the insurance does not
> put them in a brokerage or agency position.  I find
> this questionable especially since both clients that I
> reviewed are doing very little domestic Shippers
> Interest coverage, consequently, the problem may not
> have arisen.

Q.   You're not aware -- you did not discuss it with any state regulators.

A.   No, I didn't.

Q.   Either insurance or transportation.

A.   That's correct.

Q.   And you're not aware of anybody at UPS discussing it with any state regulators, insurance or transportation.

A.   No, I'm not.

Q.   Throughout the entire time that UPS was considering revising the excess value program, it never obtained a legal -- a written legal opinion relating to whether the excess value activity could be construed as insurance.

A.   I did not.

Q.   And you're not aware of UPS doing it.

A.   No, I'm not.

Q.   And you never -- UPS never prepared an opinion of even in-house counsel relating to whether the activity -- its excess value activity could be construed as insurance.

A.   Not that I'm aware of.

Q.   Pardon me?  I didn't hear you.

A.   I said -- I'm sorry -- not that I'm aware of.  I did not request one.

Q.   Even after you became concerned and started with the negotiations, you didn't ask for an opinion, a legal opinion.

A.   No.

Q.   Okay.  You indicated yesterday you were concerned about the Avis and Hertz collision damage waiver cases.

A.   And liability insurance.

Q. And liability insurance cases. Did you ever request a legal opinion as to whether UPS's activity was similar or distinguishable?

A. No.

Q. During the negotiations, did you ever request an opinion regarding whether federal transportation law preempted state regulation?

A. No, I didn't.

Q. Okay. At some point in late 1984, UPS decided to go forward with the transaction. Correct?

A. 1983.

Q. 1983. I'm sorry.

A. 1983, yes.

Q. And it --

A. I don't know if it was late in 1983.

Q. It's not my intention to quibble about the date. Sometime in 1983, UPS decided to go forward.

A. Yes.

Q. And at some point, the structure was fairly known to you. National Union would be involved, and OPL would be the reinsurer. Is that correct?

A. Yes.

Q. At that point in time, did you request a legal opinion as to whether that satisfactorily alleviated your concerns about state regulation?

A. No.

Q. Did UPS?

A. Not that I'm aware of.

Q. Now, was --

THE COURT: Mr. Johnson, could you speak up just a little bit.

THE WITNESS: I'm sorry, sir.

BY MR. KLETNICK:

Q. Was one of the aspects of your concern that UPS employees were selling excess value units in 1983?

A. That was one of my -- my concerns were that it was offered to our customers and they were accepting it in 1983.

Q. And who was it offered by?

A. It was in -- I guess, in our explanation of service, and I assume the customer service people were talking to our customers about it.

Q. So they would, in effect, be selling excess value units, wouldn't they?

A. I think it would certainly look like that. Yes.

Q. And so was that part of your concern?

A. Yes, it was.

Q. And they're not licensed as brokers.

A. No, they're not.

Q. They're not licensed as agents.

A. No, they're not.

Q. And then if there's a claim, UPS customer service personnel would on occasion settle the claim.

A. We had a claims department --

Q. Right.

A. -- yes, in the company that would settle claims. Yes.

Q.    All right.  And those people weren't licensed in various states?

A.    No.

Q.    Okay.  So was that part of your concern?

A.    Yes.

Q.    Okay.  So now after NUF comes into the picture, the same UPS employees are still meeting with the customers. Correct?  The shippers?

A.    Yes.

Q.    They're still selling the excess value units. Right?

A.    I wouldn't characterize it as -- well, call it selling if you want, but I don't --

Q.    Well, what would you call it?

A.    I don't know.  I don't know what I would call it. I don't really know how they did it is my problem.

Q.    They were going out and meeting with the customers, telling them about UPS's excess value -- the excess value charges.

A.    Yes.  I'm sure they were.

Q.    So -- and -- but you did not take the next step and obtain an opinion as to whether that would be permissible under state insurance laws?

A.    No, I did not.

With nothing more than the sketchy testimony about vague concerns by Mr. Johnson, petitioner would have us conclude that it divested itself of a very profitable $100 million per year revenue source that was based on a decades-old system for setting shipping rates that had consistently received approval of the

Federal and State Governments.  We do not believe that petitioner
would have restructured a significant portion of its business in
order to avoid a potential State law problem without having
thoroughly analyzed and considered the matter and the
ramifications that any proposed change might have.

Had petitioner been seriously concerned with State insurance
regulation, a logical question would have been whether
petitioner's EVC activity regarding interstate transportation was
preempted by Federal law.  The liability of an interstate carrier
for damage to a shipment is a matter of Federal law controlled by
Federal statutes and decisions.  See Missouri Pac. R.R. v. Elmore
& Stahl, 377 U.S. 134, 137 (1964); A.T. Clayton & Co. v.
Missouri-Kan.-Tex. R.R., 901 F.2d 833, 834 (10th Cir. 1990) ("The
Carmack Amendment codifies an initial carrier's liability for
goods lost or damaged in shipment.").  Generally, carriers are
liable for loss or damage caused by them to property they
transport.  See id.; see also Shippers Natl. Freight Claim
Council, Inc. v. ICC, 712 F.2d 740, 745 (2d Cir. 1983).

During the years in issue, pursuant to the Carmack Amendment
to the Interstate Commerce Act,[31] a motor common carrier could

---

[31]Although the substance of the Carmack Amendment
(originally 49 U.S.C. sec. 20(11) (1906)) was recodified into 49
U.S.C. secs. 11707, 10730, and 10103, these sections were
commonly termed the Carmack Amendment.  See Hughes v. United Van
Lines, Inc., 829 F.2d 1407, 1412 n.6 (7th Cir. 1987).  Effective
(continued...)

establish rates for the transportation of property under which

the liability of the carrier was limited to a value established

_____

[31](...continued)
Jan. 1, 1996, the Carmack Amendment was again recodified at 49
U.S.C. secs. 11706, 14706, and 15906.  See Accura Sys., Inc. v.
Watkins Motor Lines, Inc., 98 F.3d 874, 876 n.2 (5th Cir. 1996).

49 U.S.C. sec. 11707 (1994) provides in pertinent part:

> (a)(1) A common carrier providing transportation
> or service subject to the jurisdiction of the
> Interstate Commerce Commission * * * shall issue a
> receipt or bill of lading for property it receives for
> transportation * * *.  That carrier or freight
> forwarder and any other common carrier that delivers
> the property and is providing transportation or service
> * * * are liable to the person entitled to recover
> under the receipt or bill of lading.  The liability
> imposed under this paragraph is for the actual loss or
> injury to the property caused by [the carrier] * * *
>
>    *      *      *      *      *      *      *
>
> (c)(4) A common carrier may limit its liability
> for loss or injury of property transported under
> section 10730 of this title.

49 U.S.C. sec. 10730(b)(1) (1994) provides:

> [A] motor common carrier * * * may * * * establish
> rates for the transportation of property (other than
> household goods) under which the liability of the
> carrier * * * for such property is limited to a value
> established by written declaration of the shipper or by
> written agreement between the carrier * * * and shipper
> if that value would be reasonable under the
> circumstances surrounding the transportation.

49 U.S.C. sec. 10103 (1994) provides:

> Except as otherwise provided in this subtitle, the
> remedies provided under this subtitle are in addition
> to remedies existing under another law or at common
> law.

by written declaration of the shipper or by written agreement between the carrier and the shipper if that value would be reasonable under the circumstances surrounding the transportation.  See 49 U.S.C. sec. 11707(a)(1) (1994); see also Fabulous Fur Corp. v. United Parcel Serv., 664 F. Supp. 694, 696 (E.D.N.Y. 1987); Art Masters Associates, Ltd. v. United Parcel Serv., 567 N.E.2d 226, 227-228 (N.Y. 1990).  A motor common carrier must publish and file with the ICC tariffs containing the rates for transportation it may provide.  See 49 U.S.C. sec. 10762(a)(1) (1994); Fabulous Fur Corp. v. United Parcel Serv., supra at 696.

Petitioner offered its interstate shippers "released rates" authorized by a series of ICC Released Rate Orders (RRO).[32] Petitioner filed tariffs and tariff supplements during the years in issue which determined released value rates authorized by the ICC by Released Rates Decision MC-978.  Under the "Damaged and Unclaimed Property" provision 535 of the tariffs, if the package was damaged by petitioner, petitioner was liable to the shipper to pay the full actual or declared value of the property, whichever was lower.  Under the "Method of Determining Rates" provision of the tariffs, if a shipper did not declare value in excess of $100, petitioner collected its base rate and its

[32]Similar orders were issued by each State relating to intrastate orders.

liability was limited to $100.  If a shipper declared value in excess of $100, petitioner collected its base rate plus an EVC of 25 cents per $100 of additional declared value and its liability equaled the amount of value declared.  Thus, the EVC was part of the rate charged by petitioner, and the rates, including the EVC, were determined under the tariff.  Under both Federal law and the provisions of the tariff, petitioner was liable for damage to shippers' packages up to the declared value or $100 if no value was declared.

Even if petitioner's excess value activity could be characterized as some form of "insurance" under the various State laws, Federal law appears to preempt State law with regard to the liabilities of interstate carriers.  The Supreme Court addressed the preemptive scope of the Carmack Amendment, relating to State regulation of carrier liability, in Adams Express Co. v. Croninger, 226 U.S. 491 (1913).  There, the Court held:

> Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it. * * * [Id. at 505-506.]

Later, in Moffit v. Bekins Van Lines Co., 6 F.3d 305 (5th Cir. 1993), the Court of Appeals for the Fifth Circuit addressed the Carmack Amendment and stated:

> a purpose of the Carmack Amendment was to "substitute a paramount and national law as to the rights and liabilities of interstate carriers subject to the

Amendment."  This Court, furthermore, adopted the Supreme Court's language in Adams Express Co.:

> That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from its general character.  It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract.

> To hold that the liability therein declared may be increased or diminished by local regulation or local views of public policy will either make the provision less than supreme, or indicate that Congress has not shown a purpose to take possession of the subject.  The first would be unthinkable, and the latter would be to revert to the uncertainties and diversities of rulings which led to the amendment.  [Id. at 306-307 (citing Air Prods. & Chems. v. Illinois Cent. Gulf R.R., 721 F.2d 483, 486 (5th Cir. 1983) (quoting Adams Express Co. v. Croninger, supra at 505-506)).]

Petitioner has successfully asserted that the Carmack Amendment preempted State law which might otherwise govern a shipper's claim for damage to packages.  See Plaid Giraffe, Inc. v. United Parcel Serv., Inc., No. 94-1002-PFK (D. Kan., Sept. 26, 1994); Art Masters Associates, Ltd. v. United Parcel Serv., supra at 228-229.  Petitioner similarly defended itself in other actions by shippers for recovery of lost or damaged shipments.[33]

---

[33]In United Parcel Serv., Inc. v. Smith, 645 N.E.2d 1 (Ind. Ct. App. 1994), petitioner appealed from an action in which Glenn Smith, the shipper, filed suit against petitioner regarding an allegedly lost shipment.  Mr. Smith sought to recover $995, the
(continued...)

While we need not specifically decide whether Federal law preempts State insurance laws with respect to petitioner's excess value activity, we believe that petitioner was well aware of the preemption position and had good reason to believe that it

---

[33](...continued)
value of the lost package, from petitioner.  On appeal, petitioner advanced the position that

> Congress clearly intended the Carmack Amendment to preempt all state regulation of claims against common carriers for interstate ground shipments, and the Supreme Court has specifically so held * * * [Appellant's Opening Brief at 14, United Parcel Serv., Inc. v. Smith, supra.]

The Indiana Court of Appeals concluded that "49 U.S.C. § 10101 et seq., the Interstate Commerce Act, and specifically those portions known as the Carmack Amendment, preempt all state regulation of interstate ground shipments."  Id. at 3 (fn. ref. omitted).

In Simmons v. United Parcel Serv., 924 F. Supp. 65 (W.D. Tex., 1996), Mr. James W. Simmons filed suit in the State District Court of Bexar County, Texas against petitioner regarding two 1994 excess value shipments.  Mr. Simmons sought to recover $49,000 in damages.  On motion by Mr. Simmons to remand to the State Court, petitioner alleged that the Carmack Amendment completely preempted all State law claims.  The court stated:

> Under the "complete pre-emption doctrine," once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law. * * * Both the Supreme Court and the Fifth Circuit have held that the Carmack Amendment preempts all state law claims against a common carrier. * * * [Id. at 67 (citing Adams Express Co. v. Croninger, 226 U.S. 491 (1913); Moffit v. Bekins Van Lines, Co., 6 F.3d 305 (5th Cir. 1993)).]

The court held that the "complete pre-emption" doctrine applied and that removal from State court was proper.  See id.

applied.[34]  Nevertheless, petitioner made no attempt to analyze the issue or obtain legal advice before deciding to restructure the EVC part of its business.  This leads us to believe that petitioner's interjection of NUF and OPL into its excess value activities in 1984 was not done in order to avoid running afoul of State insurance laws and regulations.[35]

---

[34]Petitioner has not attempted to draw a distinction between concerns about interstate versus intrastate matters.  According to the testimony of petitioner's former chairman and C.E.O., in excess of 75 percent of petitioner's volume in 1984 consisted of interstate shipments and 98 percent of petitioner's volume in 1984 consisted of ground transportation.  As previously indicated, petitioner obtained authorization for its pre-1984 EVC activities from the required State transportation authorities, and no State had asserted that petitioner was not in compliance with State insurance law.

[35]As stated by Dr. Shapiro in his expert report:

Assuming the risk of state regulation was real, abandoning a profitable business because of this risk is equivalent to burning down the barn to get rid of the rats.  Even if you solved the problem, the price was too high.

\*      \*      \*      \*      \*      \*      \*

Based on my business experience, it is my strongly-held opinion that a company would not walk away from such a valuable business on a mere suspicion that it might be subject to an added risk of regulation.  Rather, in such a situation, the company would first meet with legal counsel to get an opinion as to the likelihood and business consequences of such regulation.  Next, it would analyze the financial impact of such regulation and explore how it might be able to legally avoid, minimize, or delay the impact of any potential regulation. \* \* \* [Fn. ref. omitted.]

Assuming that petitioner's excess value activity might have been considered "insurance" subject to regulation under various State laws, petitioner's "restructured" method of handling EVC's would also seem to violate State laws.  For example, in some States the sale or solicitation of insurance without authorization is a violation of State statutes.  See, e.g., Cal. Ins. Code sec. 700 (West 1993);[36] N.Y. Ins. Law sec. 109(a)

---

[36]Cal. Ins. Code sec. 700 (West 1993) provides:

§700.  Admittance required; penalties; compliance; hearings;
        issuance of certificate

(a) A person shall not transact any class of insurance business in this state without first being admitted for that class.  Admission is secured by procuring a certificate of authority from the commissioner.  The certificate shall not be granted until the applicant conforms to the requirements of this code and of the laws of this state prerequisite to its issue.

(b) The unlawful transaction of insurance business in this state in willful violation of the requirement for a certificate of authority is a public offense punishable by imprisonment in the state prison, or in a county jail not exceeding one year, or by fine not exceeding one hundred thousand dollars ($100,000), or by both, and shall be enjoined by a court of competent jurisdiction on petition of the commissioner.

Cal. Ins. Code sec. 35 (West 1993) provides:

§35.  Transact

"Transact" as applied to insurance includes any of the following:

(a) Solicitation.

(continued...)

(McKinney 1985).[37]  During 1984, petitioner provided its shippers

---

[36](...continued)
  (b) Negotiations preliminary to execution.

  (c) Execution of a contract of insurance.

  (d) Transaction of matters subsequent to execution
of the contract and arising out of it.

[37]N.Y. Ins. Law sec. 1102 (McKinney 1985) provides:

§1102.  Insurer's license required; issuance

  (a) No person, firm, association, corporation or
joint-stock company shall do an insurance business in
this state unless authorized by a license in force
pursuant to the provisions of this chapter, or exempted
by the provisions of this chapter from such
requirement.  Any person, firm, association,
corporation or joint-stock company which transacts any
insurance business in this state while not authorized
to do so by a license issued and in force pursuant to
this chapter, or exempted by this chapter from the
requirement of having such license, shall, in addition
to any other penalty provided by law, forfeit to the
people of this state the sum of one thousand dollars
for the first violation and two thousand five hundred
dollars for each subsequent violation.

N.Y. Ins. Law sec. 1101(b)(1) (McKinney 1985) provides:

§ 1101. Definitions; doing an insurance business

  (b)(1) Except as provided in paragraph two hereof,
any of the following acts in this state, effected by
mail from outside this state or otherwise, by any
person, firm, association, corporation or joint-stock
company shall constitute doing an insurance business in
this state and shall constitute doing business in the
state within the meaning of section three hundred two
of the civil practice law and rules:

        *       *       *       *       *       *       *

(continued...)

with the necessary forms upon which the shippers could declare
excess value.  The package pickup record was used by petitioner
to bill shippers for the EVC's sold.  Petitioner received and
deposited EVC income in its corporate accounts.  Thus, assuming
that the Shippers Interest Program was insurance, petitioner sold
or solicited the putative insurance in 1984.  Petitioner also
received, reviewed, defended, and paid claims.  By selling the
Shippers Interest policy, collecting the premiums, and adjusting
claims without the appropriate licenses, petitioner would
seemingly have been in violation of State statutes prohibiting
the sale, collection of premium, and adjustment of claims related
to the NUF insurance policy.  It strains credulity to believe
that petitioner attempted to avoid the requirements of State
statutes by restructuring its excess value activity in a manner
that arguably caused petitioner to remain in violation of State
statutes.[38]  Had such a restructuring occurred to avoid violating
State law, we believe that a large successful corporation such as

---

[37](...continued)
        (C) collecting any premium, membership fee,
    assessment or other consideration for any policy or
    contract of insurance;

[38]Indeed, on the question of whether petitioner's EVC
activity constitutes "insurance", petitioner fails to make any
meaningful distinction between the promise to "insure" the first
$100 of value in return for a shipping fee, which petitioner
continued after Jan. 1, 1984, and the excess value activity.

petitioner would have thoroughly analyzed the legal and business ramifications. That was not done.

Petitioner also argues that one of its business purposes for restructuring the EVC activity was to leverage the excess value profits into the creation of a new reinsurance company, which over time could become a full-line insurer. We have no doubt that transferring the profits from the EVC activity, tax free, could provide OPL with the capital to become a full-line insurer of other risks. But any investment of money into OPL could accomplish this purpose. The question here is whether petitioner earned, and must pay tax on, the funds ultimately transferred to OPL or whether the EVC profits were earned by NUF and OPL. The purpose for which the profits were ultimately used, or intended to be used, does not answer the question before us.

Petitioner alleges that another business purpose for restructuring its EVC activity was to enable it to increase its rates. Petitioner argues that by removing the excess value revenue from its operating ratio computation, it could obtain larger rate increases than would have otherwise been possible. Petitioner historically targeted a 90-percent operating ratio on its ground transportation business.[39] Petitioner alleges that

---

[39]Petitioner's operating ratio was computed as a ratio of operating expenses to operating revenue. An operating margin is the inverse of an operating ratio. Thus, a 90-percent operating
(continued...)

its operating ratios played an important role in obtaining rate increases.

We do not believe that petitioner shifted EVC income to OPL in order to justify raising its rates. The 90-percent operating ratio was a standard set by petitioner rather than a Federal or State regulatory mandate. The Motor Carrier Act of 1980 (MCA), Pub. L. 96-296, 94 Stat. 793, provided for a Zone of Rate Freedom (ZORF) for motor common carriers and freight forwarders. ZORF allowed for the filing of rate increases up to 10 percent above the rate in effect 1 year before the effective date of the proposed increase or a decrease of as much as 10 percent below the lesser of the rate in effect on July 1, 1980, or the rate in effect 1 year before the effective date of the proposed rate. See MCA sec. 11, 94 Stat. 801.[40] Petitioner did not offer any

---

[39](...continued)
ratio is equal to a 10-percent operating margin.

[40]The pertinent portion of the Motor Carrier Act of 1980, Pub. L. 96-296, sec. 11, 94 Stat. 801, provided:

ZONE OF RATE FREEDOM FOR MOTOR CARRIERS OF PROPERTY AND FREIGHT FORWARDERS

　　Sec. 11. Section 10708 of title 49, United States Code, is amended by adding at the end thereof the following new subsection:

　　(d)(1) Notwithstanding any other provision of this title, the Commission may not investigate, suspend, revise, or revoke any rate proposed by a motor common carrier of property or freight forwarder on the grounds

(continued...)

credible evidence that the various Federal and State regulatory agencies would have denied a rate increase had it retained the EVC income.  Petitioner's primary consideration in setting rates was fairness and competition, according to its former executives. Indeed, the testimony of petitioner's former executives indicates that they could have sought greater rate increases under ZORF than what was requested and that they were not concerned about maximizing rates.  In November 1984, petitioner sought and obtained from the ICC and various State regulatory bodies a 5.45-percent rate increase effective January 1, 1985.  Petitioner's rate increase of 5.45 percent was 4.55 percent less than the maximum increase allowed by ZORF.

---

[40](...continued)
that such rate is unreasonable on the basis that it is too high or too low if--,

    (A) the carrier notifies the Commission that it wishes to have the rate considered pursuant to this subsection; and

    (B) the aggregate of increases and decreases in any such rate is not more than 10 percent above the rate in effect one year prior to the effective date of the proposed rate, nor more than 10 percent below the lesser of the rate in effect on July 1, 1980 (or, in the case of any rate which a carrier first establishes after July 1, 1980, for a service not provided by such carrier on such date, such rate on the date such rate first becomes effective), or the rate in effect one year prior to the effective date of the proposed rate.

Mr. Kent C. Nelson who, during the years in issue, was a member of petitioner's board of directors and was petitioner's chief financial officer, testified as follows:

Q.   Mr. Nelson, I believe you mentioned earlier you were familiar with the rate increase in January 1985?

A.   Yes.

Q.   Was that rate increase higher or lower because of the spinoff of the [excess value] business?

A.   It's hard to tell, because the projection process projects increased volume, projected labor costs, and the revenue that we had from growing businesses that are profitable.  And it all comes together the way it comes together.  I don't know if it would have had any effect on it at the time.  It would be conjecture on my part.

*     *     *     *     *     *     *

Q.   Assuming that all other factors were equal, did the rate increase in 1985 increase or decrease because of the transfer of the excess value business.

A.   I don't think it made any difference.

Like petitioner's other alleged business justifications for restructuring its EVC activity, there is no contemporaneous documentation that petitioner investigated or considered the impact that restructuring its EVC activity would have on its shipping rates.

Petitioner also argues that by restructuring the EVC activity, it enhanced protection of the assets of its core transportation activity from the risks associated with assuming

liability for declared value in excess of $100. In order to evaluate this alleged business purpose, we will look to whether petitioner actually transferred or reduced its liability to shippers in any meaningful sense. In other words, did the rearranged EVC activity have any real economic impact on petitioner?

In 1983, petitioner supplemented tariffs filed with the ICC on behalf of UPS-New York and UPS-Ohio. Supplement provision 540-A to the tariffs provided that petitioner "may" remit excess valuation charges to an insurance company as a premium for excess valuation cargo insurance on the shipper's behalf. However, supplement provision 540-A also stated that in the event that the insurance company failed to pay any claim for loss or damage to the shipper's property under the policy, petitioner would remain liable for any loss or damage within the limits declared and paid for.[41]

_____

[41]Petitioner's service explanation also states that if NUF fails to pay any claim for loss of or damage to the shipper's property, petitioner will remain liable for loss or damage within the declared limits of the Shippers Interest contract.

The Shippers Interest contract document specifically lists the shippers under the "name and address of insured". However, the contract document also lists the address of the insured to be that of petitioner's world headquarters. Under the cancellation provision of the Shippers Interest contract, either petitioner or the "Named Insured" could terminate the contract. Thus, petitioner had the power to cancel the insurance policy that petitioner alleges was between its shippers and NUF. Of course,
(continued...)

Pursuant to tariff provision 510, filing of claims, shippers were required to allege in writing, among other things, that petitioner was liable for the loss or damage. Pursuant to tariff provision 520, time limit for filing claims, petitioner was relieved of liability under its tariff if the shipper did not file a claim with petitioner or institute a lawsuit against petitioner within 2 years and 1 day from when petitioner notified the shipper that the claim had been disallowed by petitioner. Under this provision, shippers were required to bring an action against petitioner in order to pursue their claims for damage or loss of packages. Each of the above-mentioned provisions existed in petitioner's tariffs before and during 1984. On the basis of Federal law and the provisions that remained in petitioner's tariffs, liability continued to arise under such tariffs in 1984.

Petitioner treated liability for loss or damages associated with EVC's as arising from petitioner's tariffs in accordance with Federal law. Upon commencement of a relationship with its shippers, petitioner provided most shippers with a copy of petitioner's service explanation. While the service explanation referred to NUF and the Shippers Interest contract, petitioner did not generally provide a copy of the Shippers Interest

[41](...continued)
petitioner would in any event have remained liable to its shippers for damage claims.

contract to each of its shippers. As a result of tariff requirements 510 and 520, rather than filing claims with NUF under the Shippers Interest contract, shippers were required to file a claim only "against" petitioner within a specific time in order to be compensated for loss or damage. Even at the point when petitioner adjusted shippers' claims, petitioner does not appear to have informed the shippers that NUF was the insurer of the claim or that the shippers had any recourse against NUF. Thus, shippers' claims were presented to and resolved by petitioner in accordance with the provisions of the tariff. Petitioner represented to its customers in its quarterly publications that petitioner was liable for lost or damaged packages. In December 1983, petitioner's Roundups newsletter informed its customers that petitioner's drivers would leave packages without signatures at certain delivery locations. In the newsletter, petitioner assured its shippers that UPS would continue to assume liability for lost and damaged packages up to $100 or the declared value. On the basis of the foregoing facts, we find that after January 1, 1984, petitioner remained liable to shippers who had declared a value in excess of $100.

There still remains the question of whether the arrangement with NUF and OPL sufficiently reduced petitioner's financial exposure to be recognized as having economic substance. The Shippers Interest contract provided that NUF was not liable for

the first $100 of value, and in no event did NUF's liability
exceed the declared value of a shipper's package.  The Shippers
Interest contract also provided that if petitioner's liability
for loss or damage to a shipper's package was covered by another
insurance policy, then NUF would not be liable for the amount
covered by petitioner's other insurance policy.  Other insurance
did exist.

Throughout 1984, petitioner maintained an insurance policy
with Affiliated FM Insurance Co. (AFM policy) that covered
petitioner's liability for loss or damage to shipper's
packages.[42]  Petitioner paid annual installment premiums of
$356,945 of which $86,820 was allocated to property value related
to parcels in transit.  Under the policy, $86,820 of annual
premium provided coverage for an average daily parcel value of
$354,369,000.  The AFM policy provided for a $25,000 deductible
to all loss claims arising out of a loss occurrence.

To the extent that other insurance did not exist, the
Shippers Interest contract generally did not limit claims to any
maximum amount per loss occurrence.[43]  The AFM policy covered

---

[42]Petitioner's purchase of the AFM policy and its operation
effect of covering "petitioner's liability" for packages shipped
during 1984 is inconsistent with petitioner's argument that it
had no such liability to shippers after Jan. 1, 1984.

[43]With respect to packages sent "UPS 2nd day Air" or "UPS
next day air", the Shippers Interest contract limited NUF's
(continued...)

petitioner's liability for package losses related to any single occurrence to the extent the liabilities were greater than $25,000 but did not exceed $10 million.  Thus, there was a theoretical exposure for NUF and OPL, to the extent that one or more loss occurrences resulted in more than $10 million in loss per occurrence.  For example, if petitioner incurred liability to shippers as a result of a single occurrence of three times the $10 million limit that petitioner was insured for under the AFM policy in 1984, NUF/OPL would have been liable for approximately $20 million.[44]  (Twenty million dollars in additional claims would have reduced the gross profit percentage from EVC's in 1984 from 78 percent to 58 percent.)  Even in this unlikely event, excess value revenue in 1984 would have exceeded over two times the amount of claims paid.  Considering the extreme magnitude of a catastrophe that would have to occur before claims exceeded excess value revenue in a given year, we again find it unrealistic that petitioner or NUF/OPL would realize a loss in its excess value activity.[45]

_____

[43](...continued)
liability to $25,000 per package.

[44]Disregarding the $25,000 deductible, petitioner would have coverage of $10 million under the AFM policy, and NUF/OPL would be liable for claims in excess of that.

[45]The only potential financial benefit that petitioner could realize from its arrangement with NUF and OPL was if liabilities
(continued...)

Petitioner must have drawn the same conclusion.  Through the AFM policy, petitioner was able to cover its liability for up to $10 million for any single occurrence in return for premiums of $86,820.[46]  This amount of premium is less than one-tenth the amount petitioner agreed to pay NUF to be a "front" in the restructuring of the excess value activity.  NUF and OPL were not liable for losses attributable to a single occurrence, to the extent such losses were between $25,000 and $10 million.  Petitioner, in turn, was not dependent upon NUF and OPL for single-occurrence catastrophic losses above the deductible of $25,000 and under $10 million but would have been able to procure coverage for such liability in excess of $10 million for a relatively nominal premium.

Petitioner had a conservative, risk-averse insurance philosophy and sought to have sufficient coverage to protect its assets from a catastrophe.  In 1983, petitioner considered raising the $10 million AFM policy limit to $20 million.  In a letter dated May 26, 1983, sent by Mr. Edmund Mihich, of Hall, to Mr. Johnson and Mr. Eugene Schoenleber of petitioner's insurance department, Mr. Mihich wrote:

---

[45](...continued)
for lost and damaged shipments were to exceed EVC revenue that it had given up.

[46]This AFM coverage excludes liabilities of up to $25,000 per occurrence.

Please allow this letter to confirm our telephone discussion of May 25, 1983 with regard to the * * * [AFM policy].

    *      *      *      *      *      *      *

With regard to your interest in increasing the unnamed location and transit sub-limits from $10,000,000 to $20,000,000, Allendale has requested to be provided with the exposure data which creates this request. Gene, as I indicated to you on the telephone, it was Allendale's understanding that the present $10,000,000 limit provided was far more than sufficient. * * * With regard to the transit limit, Allendale was under the impression that there was no situation in which the exposure approached anywhere near the $10,000,000 mark.

Both Allendale (AFM's parent) and Hall considered petitioner's AFM policy limit of $10 million to be substantially more coverage than necessary to insure against losses that petitioner's transit operation exposed petitioner to. Petitioner chose not to increase the limits on the AFM policy to $20 million, further indicating to us that there was no realistic possibility that petitioner or NUF/OPL would realize a loss in its excess value activity. Because the AFM policy was in effect before, during, and after the time when petitioner restructured its excess value activity, we do not find any relationship between petitioner's goal of protecting against catastrophic loss and the restructuring of petitioner's excess value activity.[47]

---

[47]An endorsement was added to the Affiliated FM policy effective Jan. 1, 1984, which referred to the Shippers Interest contract. However, petitioner maintained the same level of coverage and deductible of the Affiliated FM policy that existed

(continued...)

The AFM policy did not provide benefits for damage to packages below the $25,000 single occurrence deductible. Such losses could also theoretically have exceeded EVC revenue. However, petitioner's excess value losses were part of a very large universe of shipments, and the ratio of losses to EVC's remained consistent over many years and was therefore predictable.[48] The following schedule reveals the consistency of claims paid by petitioner for damages in excess of $100:

---

[47](...continued)
before the execution of the Shippers Interest contract.

[48]Petitioner had been engaged in a declared value program since the 1950's.

| Year | EVC's | Claims Over $100 Paid[1] | EVC's less Claims Paid | Ratio[2] |
|------|-------|---------------------------|------------------------|----------|
| 1979 | $49,200,000 | $13,800,000 | $35,400,000 | 72.0% |
| 1980 | 57,900,000 | 16,200,000 | 41,700,000 | 72.0 |
| 1981 | 70,512,000 | 20,007,000 | 50,505,000 | 71.6 |
| 1982 | 73,816,000 | 21,372,000 | 52,444,000 | 71.0 |
| 1983 | 78,000,000 | 23,000,000 | 55,000,000 | 70.5 |
| 1984 | 99,794,790 | 22,084,012 | 77,710,778 | 77.9 |
| 1985 | 119,077,863 | 36,236,469 | 82,841,394 | 69.6 |
| 1986 | 140,255,469 | 43,499,702 | 96,755,767 | 69.0 |
| 1987 | 161,098,590 | 52,509,376 | 108,589,214 | 67.4 |
| 1988 | 187,106,344 | 67,230,962 | 119,875,382 | 64.1 |
| 1989 | 208,596,033 | 77,214,084 | 131,378,949 | 63.0 |

[1]Amounts in this column for 1979 and 1980 are estimated amounts.
[2]This column represents the ratio of excess value income less claims paid divided by total excess value income.

Petitioner's excess value claims payments over 11 years never exceeded 40 percent of the total excess value income. Considering the consistency of the ratio of loss claims payments to EVC revenue from year to year, we find that the possibility that total cumulative annual payments for shipping losses from single occurrences involving less than $25,000 might exceed EVC revenue was so remote, that for all practical purposes, it was

nonexistent.[49]  As a result, the level of risk, if any, that was
shifted from petitioner to NUF and OPL was insignificant.

The possibility that cumulative catastrophic losses in
excess of the $10 million per-occurrence limit on the AFM policy
would occur, and that claims for occurrences involving less than
$25,000 would increase dramatically, and that, either
individually or in combination, they would exceed total EVC's,
was improbable, unrealistic, and insignificant.  We find that
these theoretical possibilities had nothing to do with
petitioner's motivation for transferring the EVC profits, less
fronting costs, to OPL and that the insertion of NUF and OPL into
petitioner's EVC activity provided no significant nontax benefit
to either petitioner or its shippers.

---

[49]We agree with respondent's expert Mr. Edward T. Kelley,
who concluded as follows:

> As a general rule, the firm would prudently retain
> exposures which could be expected to generate
> reasonably predictable numbers of claims and relatively
> stable and consistent amounts of total loss, and seek
> to transfer exposures with substantially lower
> predictability and greater volatility to an insurer
> willing to assume liability for such exposures at terms
> acceptable to the firm.  Since * * * [petitioner], by
> the nature of its operations, generates a very large
> number of relatively homogeneous units of exposure, the
> predictability of expected losses related to shippers'
> property in its custody is very high and year to year
> variability is relatively limited.  Its self-insurance
> program for handling claims for loss of or damage to
> shippers' property produced consistently profitable
> results during the years 1979 through 1982 * * *.

Another factor in determining whether a particular transaction was a sham is the presence or absence of arm's-length price negotiations and the relationship between the price and fair market value. See Helba v. Commissioner, 87 T.C. 983, 1005 (1986), supplemented by T.C. Memo. 1987-529, affd. 860 F.2d 1075 (3d Cir. 1988); see also Karme v. Commissioner, 73 T.C. 1163, 1186-1190 (1980), affd. 673 F.2d 1062 (9th Cir. 1982). In deciding such issues, courts often look to expert opinions. The Court is not bound by the opinion of any expert, and we may accept or reject in full or in part experts' opinions proffered by the parties. See Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994); Parker v. Commissioner, 86 T.C. 547, 562 (1986). Both petitioner and respondent offered the reports and testimony of various expert witnesses in an effort to establish an arm's-length price that petitioner could have obtained for the coverage provided by NUF and OPL.

Respondent offered the expert report of Mr. Kelley for the purpose of proving that, within the insurance industry, the arm's-length price that petitioner could have obtained for coverage associated with petitioner's excess value activity would have been substantially less than 25 cents per $100 of excess value. Mr. Kelley has in excess of 30 years of experience buying

and providing insurance and reinsurance products.  In his report,

Mr. Kelley stated:

> The .25 per $100 of declared value charges used on the
> NUF policy was apparently derived directly from * * *
> [petitioner's] tariff filing, and bore no reasonable
> relationship to the rate that would have been developed
> in a competitive marketplace for a comparable insurance
> arrangement transacted on an "arm's length" basis.
> * * *  For the period 1984 through 1989 total premium
> received and losses paid on the NUF policy amounted to
> approximately $845,000,000 and $281,000,000,
> respectively, for an overall loss ratio of 33% * * *.
> There was little or no potential for late reported
> claims or significant adverse reserve development on
> business of this kind, so the numbers reflected on
> NUF's premium and loss bordereaux may be treated as
> final for the years involved.
>
> In a competitive marketplace such results could never
> be achieved.  * * *  it should be noted that the U.S.
> property-casualty insurance industry has achieved a
> combined ratio (the sum of the loss ratio (incurred
> losses ÷ earned premium) plus the expense ratio
> (expenses ÷ written premium) of less than 100%, i.e.,
> produced an underwriting profit) in only three of the
> past twenty years * * *.
>
> It is also extremely unlikely that any insurance broker
> that permitted an insurer to generate such profits at
> the expense of its client could expect to retain that
> client for very long.  In this instance, of course, the
> profits were not retained by NUF, but flowed, as
> intended, as ceded reinsurance premiums back to OPL.

Mr. Kelley logically concluded that the 25-cent price per $100 of

excess value set on the NUF policy was not an arm's-length price

that would have been agreed upon in a competitive market.[50]

---

[50]Similarly, respondent's expert Mr. Michael Cohen, an
insurance expert with extensive brokerage experience, agreed that
the 25 cents per $100 of excess value was too high.  Referring to
(continued...)

This conclusion is also supported by comparing the 25-cent price paid to NUF with the price that was offered by FFIC and PIP. For more than 15 years before 1983, FFIC, through a policy sold by PIP, solicited and sold excess value coverage to petitioner's shippers. Generally, PIP sold the excess value coverage at a price of $0.125 per $100 of coverage. PIP retained approximately 36 percent of the premium in 1983 and 34 percent in 1984. Thus, of the $0.125 per $100 of coverage, PIP retained approximately $0.045 and $0.0425 in 1983 and 1984, respectively.[51] On the other hand, FFIC underwrote the coverage for approximately 8 cents[52] per $100 of coverage in 1983 and $0.0825[53] in 1984. FFIC was able to realize a gross profit margin of 27 percent in 1983, based on an approximate price of 8 cents per $100 of excess value coverage.[54] The FFIC/PIP program

---

[50](...continued)
petitioner's loss ratios and declared revenues for 1981 through 1983, Mr. Cohen stated in his expert report:

> In my experience spanning more than thirty years I cannot recall one case where the broker would offer the insurer on behalf of his client a piece of business at such an advantageous rate. * * *

[51]The $0.125 price times 36 percent and 34 percent equals $0.045 and $0.0425, respectively.

[52]$0.125 less $0.045 equals $0.08.

[53]$0.125 less $0.425 equals ($0.0825).

[54]Gross profit margin in this instance is defined as

(continued...)

did not offer coverage to certain high-risk shippers.
Nevertheless, the coverage underwritten by FFIC was very similar
to that which was purported to be provided by NUF and OPL and is
an indication that the price of the excess value coverage
provided by NUF and OPL was substantially more than the price
petitioner could have obtained in arm's-length negotiations.[55]

Respondent's expert, Prof. Alan Shapiro, Ph.D., professor of
finance and business economics, estimated that $0.092 per $100 of
declared value in excess of $100 would have been an arm's-length
price for insurance covering petitioner's excess value activity.
Professor Shapiro based his analysis on the proposition that an
arm's-length price for OPL's excess value coverage would be one
that over time provided OPL with a fair return on its necessary
equity investment.

In coming to his conclusion, Professor Shapiro compared what
OPL's return on equity would have been had it been reinsuring the
EVC activity during the years 1979 through 1983 with that of

---

[54](...continued)
premiums minus claims paid minus commissions.

[55]Had petitioner's customers paid $0.125 per $100 of
declared value (the same as PIP charged), EVC revenues would have
been cut in half, but the gross profit percentage (one-half of
EVC's, less all claims paid, divided by one-half of EVC's) for
the years 1979 through 1989 would have been 37 percent. One-half
of EVC revenue for 1979 through 1989 is $622,678,544 less actual
claims paid of $393,153,605 equals gross profit of $229,524,939.
Gross profit of $229,524,939 divided by $622,678,544 equals a
gross profit percentage of 37 percent.

other members of the insurance sector OPL would have operated in.
Professor Shapiro's report contained the following chart, which
includes Value Line[56] statistics regarding return on equity in
each year for 22 property/casualty insurers and diversified
insurance companies:

|  | 1979 | 1980 | 1981 | 1982 | 1983 | Mean |
|---|---|---|---|---|---|---|
| Mean Value Line ROE | 23.5% | 20.4% | 20.5% | 13.8% | 11.8% | 18.0% |
| Estimated Value Line $k_e$[1] | 18.5 | 20.0 | 22.5 | 19.2 | 17.1 | 19.5 |
| Minimum Value Line ROE | 12.4 | 8.3 | 9.7 | 0.1 | 0.1 | 6.1 |
| Maximum Value Line ROE | 39.6 | 40.0 | 42.3 | 26.6 | 27.1 | 35.1 |
| OPL's estimated ROE ($0.25 charge) | 172.9 | 170.1 | 182.3 | 174.1 | 168.6 | 173.6 |
| OPL's estimated ROE ($0.092 charge) | 15.7 | 15.8 | 15.2 | 13.5 | 12.8 | 14.6 |
| Estimated OPL $k_e$ | 13.7 | 15.2 | 17.7 | 14.3 | 12.3 | 14.6 |
| Value Line sample size | 22.0 | 22.0 | 22.0 | 22.0 | 22.0 | |

[1] "$k_e$" is the estimated year-by-year cost of equity capital.
Professor Shapiro concluded that had OPL been in existence during
the periods preceding 1984 and had it charged a fee of 25 cents
(instead of $0.092) per $100 in excess value coverage, it would
have earned huge persistent returns and that "OPL's ROE would

---

[56]  Value Line is a publication widely used as a source of
financial data.

have been over four times as large as the highest return earned by any of the Value Line companies in any year, and its average ROE of 173.6 percent would have been almost 10 times the average ROE of 18.0 percent earned by the Value Line companies."

Respondent also offered the expert report of Mr. Frederick Kilbourne, an actuary, for his opinion regarding an arm's-length premium for the coverage associated with petitioner's excess value activity.  In computing the premium rate, Mr. Kilbourne analyzed the following premium elements:

1. Losses (payments to claimants)

2. Claim expenses

3. Other expenses (commissions, taxes, etc)

4. Investment income

5. Risk charge (provision for profit and catastrophes)

Mr. Kilbourne determined on an actuarial basis the following rates per premium element (in cents per $100 of coverage):

1. Losses               7.5¢

2. Claims expenses      0.0

3. Other expenses       0.4

4. Risk charge          0.4

5. Investment income    -.2

Total                   8.1¢

Additionally, Mr. Kilbourne concluded that if claim expenses were to be covered within the premium rate, as is customary in the

industry, the needed rate would increase from 8.1 cents to about 8.6 cents.

Respondent's expert Dr. Blaine Nye, an insurance economist, explained in his expert report that an insurance company would price a policy by calculating the expected losses and expenses and adding an underwriting profit margin. Dr. Nye used the capital asset pricing model to derive an underwriting profit for petitioner's excess value activity. Dr. Nye concluded that the arm's-length price of an insurance arrangement providing coverage on the liability to shippers declaring values in excess of $100 to be 32 percent of declared value revenues. Thus, according to Dr. Nye, petitioner would have paid a price of approximately 8 cents (32 percent of 25 cents) per $100 of coverage to insure its excess value activity liability.

One of the experts presented by petitioner at trial implicitly acknowledged that petitioner could have negotiated a lower arm's-length price for the coverage provided by NUF and OPL. Petitioner presented Dr. Neil Doherty as an expert in the economics of insurance. On cross-examination, Dr. Doherty responded as follows:

> Q. From purely insurance pricing perspective, would you agree that if Overseas Partners, Limited, was entirely unrelated to UPS, had no common shareholders, no common officers, no common board of directors, that this transaction would have made little sense from UPS's perspective?

A.    Everything else in the transaction was the same except that the ownership of OPL was different, it was totally unrelated?

Q.    And from an insurance pricing perspective, the question is whether that -- the transaction would make sense from UPS's perspective.

A.    That's a little difficult to answer.  It would be very strange to think if UPS had the opportunity to sell insurance, either directly or indirectly, at the prices which were prevailing in that marketplace at that time, it would be a rather strange business decision to basically give off that profit to an outsider.

As previously explained, in 1984 the EVC's billed by petitioner were $99,794,789.67 and claims paid were $22,084,011.93.  Thus, claims paid in 1984 represented approximately 22 percent of the total EVC's billed.[57]  Claims paid during the years 1979 through 1983 represented approximately 28.6 percent of the total EVC's billed during those years.  After carefully considering the entire record, including the expert reports offered by both petitioner and respondent, we are persuaded that the price of 25 cents per $100 of excess value liability paid to NUF pursuant to the Shippers Interest contract that petitioner and NUF agreed to was not a result of arm's-

---

[57] $22,084,011.93 divided by $99,794,789.67 equals approximately 22 percent.  When claims are added to fronting expenses of $1,000,000 and taxes and board and bureau charges of $4,091,586 for 1984, the claims and fees increase to $27,175,597.93, and the ratio increases from 22 percent to approximately 27 percent.  $22,084,011.93 plus $1,000,000 plus $4,091,586 equals $27,175,597.93.

length negotiations and that the price of 25 cents per $100 was far in excess of the price that could have been negotiated by petitioner.  This is another indication to us that petitioner's arrangement with NUF and OPL was a sham.

Finally, unlike petitioner's purported business reasons for its arrangement with NUF and OPL, there is contemporaneous documentation to establish that petitioner seriously considered and was motivated by the reduction of Federal income tax that would occur by transferring excess value income to OPL.  In July 1982, petitioner's tax manager and another employee prepared a memorandum to Mr. Danielewski concerning tax and other implications of the insurance business.  The memorandum was prompted by a meeting at which petitioner's EVC program was discussed.  In September 1982, Hall prepared a memorandum regarding the feasibility of creating a United Parcel Service Insurance Subsidiary.  Throughout the memorandum, Hall noted that there were a number of tax benefits if an offshore insurance company were to be created.  The tax benefits were stated to be approximately $24 million.

In summary, the report states:

It has been the purpose of this brief preliminary
report to consider in some detail the immediate
potential available to [petitioner] in maximizing the
profit potential in the declared value protection which
you are currently providing shippers and also to
acquaint you with some of the basic issues involved in
a captive operating in either a traditional role or

within the context of the declared value program as an insurance subsidiary.

It appears obvious to us that the conversion of the declared value program to an insured basis utilizing an offshore insurer and F.I.R.S.T. will increase the profits generated by this program by approximately $24,000,000. It is also obvious that there are many complex issues involved in this conversion which should be considered by counsel.

The potential increase in after-tax profits appears to be totally dependent on projected savings in Federal income tax.

In March 1983, Hall prepared a memorandum that contained a description of the tax benefits if petitioner used the alternative structure for the excess value program. The memorandum indicated that the projected tax benefit to petitioner was $16,077,500 for the first year. Hall arrived at this amount by calculating the benefit to petitioner to be equal to the elimination of income tax on petitioner's expected EVC income, less the fronting fees, premium taxes, Federal excise taxes, and ceding commission. Thus, the documents generated by Hall portray the tax results of creating a Bermuda insurance company as the focus for improving the economic result of the transaction. The memorandum stated that the projection of tax savings prepared by Hall was to be submitted to petitioner's senior management by Mr. Danielewski.

Petitioner subsequently postponed its decision to go forward with the proposed EVC activity structure because of tax

considerations. NUF had prepared a binder for the Shippers Interest contract to become effective as of August 8, 1983. On the same day the contract was to become effective, Mr. Corde sent a telex to Mr. Smetana indicating that petitioner postponed the finalization of the Shippers Interest program to allow for petitioner's review and evaluation of pending tax legislation. In April 1984, after restructuring its EVC activities, petitioner released a report to shareholders in which petitioner indicated that because OPL was organized as a Bermuda corporation doing no business in the United States, OPL's earnings were not expected to be subject to U.S. Federal or State taxes on income.

The contemporaneous documentation prepared by petitioner and Hall regarding the plan to restructure the excess value activity emphasized the resulting tax benefits to petitioner. Petitioner produced no documentation, such as corporate minutes, that was prepared during the period in which petitioner was considering or executing its EVC restructuring that indicates that petitioner had motives other than tax reduction.

Petitioner has failed to prove that the restructuring of its EVC activity was motivated by nontax business reasons or that the restructuring had economic substance. Rather, we find that the restructuring was done for the purpose of avoiding taxes and that the arrangement between petitioner, NUF, and OPL had no economic

substance or business purpose.[58]  Petitioner controlled and performed all activities and functions that resulted in EVC revenue.  The EVC profits that were transferred to OPL for the benefit of petitioner's and OPL's shareholders were the fruition of petitioner's EVC activity.  OPL provided nothing of value to petitioner.  The purpose of the arrangement with NUF and OPL was to confer tax-free benefits on petitioner's and OPL's shareholders.  Obviously, petitioner is not entitled to any deductions for profits transferred to OPL.  As a result, petitioner must include EVC revenue in income for 1984 and is liable for tax on the resulting profits.[59]

---

[58]In arriving at our finding, we recognize that some of petitioner's witnesses testified that they considered State insurance regulation and other nontax considerations to be reasons for restructuring petitioner's EVC program.  We have fully considered that testimony, the demeanor of the witnesses, and the statements they made before trial (in both contemporaneous documents and interviews) in addition to the aforementioned matters discussed in the text.  In the final analysis, we do not believe that nontax business considerations were the reasons that motivated petitioner.

[59]Because we have held that petitioner's arrangement with NUF and OPL was an assignment of income and a sham, we do not reach the issue of whether an allocation must be made under sec. 482 or 845.  Petitioner makes no argument that a sec. 482 analysis should be preferred over an assignment of income analysis.  Nevertheless, we are aware that several court opinions appear to have expressed a general preference for application of a sec. 482 analysis over the assignment of income analysis.  We believe those opinions are distinguishable because the facts in the instant case are both "more extreme" and "heavily freighted with tax motives".  Cf. Foglesong v. Commissioner, 621 F.2d 865 (7th Cir. 1980), revg. and remanding T.C. Memo. 1976-294; Rubin
(continued...)

II.  Section 162 Deductions

Having held that petitioner's restructuring of its excess
value activity constituted a sham transaction that had no
economic effect, we are presented with the question of whether
petitioner is entitled to deduct the amounts retained by NUF.
The amounts retained consisted of NUF's "commission" of $1
million plus allowances for various costs.

Section 162 allows as a deduction all ordinary and necessary
expenses paid or incurred during the taxable year in carrying on
any trade or business.  See sec. 162(a).  However, expenses
incurred in furtherance of a sham transaction are not deductible.
As stated by the Court of Appeals for the Eleventh Circuit in
Kirchman v. Commissioner, 862 F.2d at 1490:

> The sham transaction doctrine requires courts and
> the Commissioner to look beyond the form of a
> transaction and to determine whether its substance is
> of such a nature that expenses or losses incurred in
> connection with it are deductible under an applicable
> section of the Internal Revenue Code.  If a
> transaction's form complies with the Code's
> requirements for deductibility, but the transaction
> lacks the factual or economic substance that form
> represents, then expenses or losses incurred in
> connection with the transaction are not deductible.

The Court of Appeals for the Second Circuit recently addressed a
similar issue with respect to interest deductions under section

---

[59](...continued)
v. Commissioner, 429 F.2d 650 (2d Cir. 1970), revg. and remanding
51 T.C. 251 (1968).

163. In <u>Lee v. Commissioner</u>, 155 F.3d 584 (2d Cir. 1998), affg. in part and remanding in part on another ground T.C. Memo. 1997-172, the taxpayers had entered into a sham investment transaction solely for the purpose of claiming tax deductions. See <u>id.</u> at 586. The taxpayers argued that interest arising from economically empty transactions may still be deducted so long as the debt itself has economic substance. The Court of Appeals for the Second Circuit declined to accept the taxpayers' argument and held that in order for an interest deduction to be valid under section 163, the underlying transaction must have economic substance. See <u>id.</u> at 587. In <u>Brown v. Commissioner</u>, 85 T.C. 968 (1985), affd. sub nom. <u>Sochin v. Commissioner</u>, 843 F.2d 351 (9th Cir. 1988), we held that deductions claimed by the taxpayers were not allowable because they were connected to sham transactions.

We have found that petitioner's restructuring of its EVC activity was a sham set up to reduce tax. Following the reasoning in cases such as <u>Kirchman v. Commissioner</u>, <u>supra</u>; <u>Lee v. Commissioner</u>, <u>supra</u>; and <u>Brown v. Commissioner</u>, <u>supra</u>, we hold that the amounts retained by NUF are not deductible.

## III. <u>Liberty Transaction</u>

Respondent disallowed deductions taken by petitioner for premiums paid to Liberty Mutual Fire for California workers' compensation and employers' liability insurance coverage.

In 1983, petitioner notified the State of California of its intention to terminate its self-insurance program for workers' compensation, and the State acknowledged petitioner's intention. Petitioner complied with State regulations and received State approval to terminate its self-insurance activity.  Petitioner's future obligations for 1984 under California's workers' compensation were covered by the Liberty Mutual policy.  Liberty Mutual entered into a reinsurance agreement with OPL wherein OPL reinsured Liberty Mutual's exposure for claims not exceeding $250,000 for any one accident.  There is no question that the Liberty Mutual policy was a valid policy that satisfied petitioner's workers' compensation responsibilities.

In calculating taxable income, section 162(a) permits the deduction from gross income of all ordinary and necessary expenses incurred in carrying on a business.  Premiums for insurance, including those for workers' compensation coverage, are deductible business expenses.  See sec. 1.162-1(a), Income Tax Regs.  The insuring taxpayer deducts the amounts paid as premiums but, of course, cannot deduct covered claims because the source of the payments is the insurance carrier.  See Clougherty Packing Co. v. Commissioner, 811 F.2d 1297, 1300 (9th Cir. 1987), affg. 84 T.C. 948 (1985).

In lieu of purchasing insurance, one may elect to self-insure, paying off claims as they arise or setting aside fixed

sums into a reserve account to pay off intermittent losses.  See id.  While insurance premiums are deductible, amounts placed into self-insurance reserves are not.  See id.; Steere Tank Lines, Inc. v. United States, 577 F.2d 279, 280 (5th Cir. 1978); Spring Canyon Coal Co. v. Commissioner, 43 F.2d 78, 80 (10th Cir. 1930), affg. 13 B.T.A. 189 (1928).  Instead, the self-insuring taxpayer must wait until losses actually occur, at which time the reserve funds actually paid out may be expensed and deducted from gross income.  See Clougherty Packing Co. v. Commissioner, supra.

Neither the Code nor the regulations provides a definition of insurance.  The accepted definition for purposes of Federal income taxation dates back to Helvering v. Le Gierse, 312 U.S. 531, 539 (1941), in which the Supreme Court stated that "Historically and commonly insurance involves risk-shifting and risk-distributing."  Shifting risk entails the transfer of the impact of a potential loss from the insured to the insurer.  See Clougherty Packing Co. v. Commissioner, supra.

Respondent concedes that the Liberty Mutual policy is a valid insurance contract which operates to shift the insurance risk from petitioner to Liberty Mutual with respect to losses in excess of $250,000.  Respondent seeks to segregate the "premiums" related to the liability in excess of $250,000 from the amounts paid to Liberty Mutual for liability below $250,000.  Respondent argues that amounts paid to Liberty Mutual under the workers'

compensation insurance policy related to liability for claims below $250,000 are not deductible as premiums.[60]

Respondent does not argue that the terms of the controlling documents are insufficient to constitute insurance or that the contractual terms of Liberty Mutual's reinsurance with OPL negate the existence of insurance. Rather, respondent argues that although petitioner had a formal insurance agreement with Liberty Mutual, "in practice" petitioner and Liberty Mutual disregarded the transactional documents in subsequent years and allowed OPL, through Liberty Mutual, to collect an increased premium when losses increased in subsequent years. There is no evidence that this alleged "practice" in later years was part of any agreement in 1984.

Pursuant to the workers' compensation arrangement, Liberty Mutual accepted a measurable degree of risk in entering the insurance contract with petitioner.[61] Apparently, respondent's only complaint is that in the 10 years after the year in issue, petitioner paid Liberty Mutual additional amounts as premiums (based on loss experience) that it was not required to pay under

[60]Respondent questions the validity of $11,151,675 of a total payment to Liberty Mutual of $14,241,915.

[61]Liberty Mutual was also required to investigate and adjust all claims made under the policy. Consequently, petitioner avoided the costs inherent in administrating its own self-insurance program and avoided the regulatory requirements of that activity.

the terms of the policy and that these amounts were passed on to OPL.  If that is so, respondent can no doubt question the deductibility of those payments in subsequent years.  But there appears to be no question that the premium payments to Liberty Mutual in 1984 were required by the policy, the policy was valid, and by the written terms of the policy risk was shifted.  We reject respondent's argument that premiums paid in 1984 were not deductible by petitioner.

IV.  Additions to Tax

Respondent determined that petitioner is liable for additions to tax for negligence under section 6653(a)(1) and (2) for 1984.  Section 6653(a)(1) imposes a 5-percent addition to tax if any part of any underpayment of tax required to be shown on a return is due to negligence or intentional disregard of rules or regulations.  Section 6653(a)(2) provides for a separate addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.  Respondent's determination is presumed correct, and petitioner bears the burden of proving otherwise.  See Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Negligence within the meaning of section 6653(a) has been defined as the failure to do what a reasonable and ordinarily

prudent person would do under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985).

With respect to the restructuring of the excess value income, we have found that petitioner engaged in ongoing sham transactions devoid of economic substance during the year at issue. Petitioner is a sophisticated taxpayer. The primary thrust of petitioner's argument was that it had valid business purposes for restructuring its EVC activities. We have not accepted this explanation. On the basis of the record as described above, we reject any contention that petitioner had a reasonable basis for the positions taken on the returns. We, therefore, sustain respondent's determination under section 6653(a)(1). We further sustain respondent's determination under section 6653(a)(2) with regard to that portion of the underpayment of tax that is attributable to the excess value charges.

Respondent also determined that petitioner is liable for an addition to tax for 1984 under section 6661. Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of the underpayment attributable to a substantial understatement of income tax. See Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). In the case of a corporation, other than an S corporation or personal holding company, an understatement is substantial if it exceeds the greater of $10,000 or 10 percent of

the tax required to be shown on the return. See sec. 6661(b)(1)(A) and (B). The amount of the understatement may be reduced under section 6661(b)(2)(B) for amounts adequately disclosed or supported by substantial authority. Respondent's determination of the addition to tax is presumed correct, and petitioner bears the burden of proving otherwise. See Rule 142(a); Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337.

The authority cited by petitioner on brief does not support its position with respect to its excess value activity. We sustain respondent's determination with respect to the understatement related to the excess value activity.

Respondent also determined that petitioner is liable for increased interest under section 6621(c)[62] for 1984 on the portion of the deficiency attributable to EVC's. Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) on substantial underpayments that exceed $1,000 and are attributable to "tax motivated transactions".

---

[62]The Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535, 100 Stat. 2750, amended sec. 6621 to include sham or fraudulent transactions in the list of "tax motivated transactions" set forth in sec. 6621(c)(3). The amendment applies (1) to any underpayment with respect to which there was not a final court decision before the enactment of the act (i.e., Oct. 22, 1986), and (2) to interest accruing after Dec. 31, 1984. See Price v. Commissioner, 88 T.C. 860, 888 (1987).

Tax-motivated transactions include "any sham or fraudulent transaction."  Sec. 6621(c)(3)(A)(v).[63]  We have held that with respect to the restructuring of the excess value activity, petitioner engaged in sham transactions lacking in economic substance.  On the basis of the findings set forth herein, and the fact that the underpayment of tax will exceed $1,000 in 1984, section 6621(c) is applicable to the underpayment attributable to those transactions that we have found to be shams.  See Price v. Commissioner, 88 T.C. 860, 888-889 (1987).

Decision will be entered
under Rule 155.

---

[63]See supra note 62.